Per Curiam :
This case was referred pursuant to Eule 45 to Mastín G. White, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed November 14, 1961. Briefs were filed by both parties, exceptions to the commissioner’s report were taken by both parties, and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Eule 38 (c).
*689• Reed, Justice (Bet.), sitting by designation, participated in the consideration and decision of this case in place of Whitaker, Judge.
OPINION OE COMMISSIONER
The plaintiff is a Kentucky corporation that maintains its manufacturing plant and office in Louisville, Kentucky. At all times material to this litigation, the plaintiff was owned and operated by members of the Vogt family. The principal officers of the corporation were two brothers, Ernest L. Vogt, who served as president, and Alvin R. Vogt, who served as vice president and purchasing officer.
During the period 1949-1950, the plaintiff manufactured for the Army 312 portable gasoline tent heaters and an equal number of kits containing spare parts and tools for the heaters. This was done under a contract dated J une 24,1949, between the plaintiff and the Government (represented by a contracting officer of the Quartermaster Corps, Department of the Army).
The plaintiff contends in the present litigation that it was delayed in the performance of the contract, and that its costs were increased, because of numerous failures on the part of the Government to take with reasonable promptness actions which the Government was obligated to take under the contract and upon which the plaintiff was dependent for the progress of its operations in the manufacture of the heaters and other items pursuant to the contract.

Sample Heater

A major complaint of the plaintiff in the present litigation relates to the alleged failure of the Government to furnish with reasonable promptness a sample heater which the plaintiff needed for use as a model in manufacturing the heaters and spare parts called for by the contract of June 24,1949. In this connection, the Court of Claims has held that where the Government is required by the terms of a contract to furnish to its contractor materials or services that are needed by the contractor in the performance of the contract, the Government is under an implied obligation to act with due diligence in the matter and will be liable for any damages *690that ensue to the contractor from a willful or negligent failure to furnish the materials or services when they are needed by the contractor. Peter Kiewit Sons' Co., Inc. v. United States, 138 Ct. Cl. 668, 674-675 (1957). Therefore, with regard to the plaintiff’s complaint against the Government relative to the furnishing of a sample heater, it is necessary to determine whether the Government was required by the terms of the contract to furnish a sample heater to the plaintiff, and, if so, whether the Government acted with due diligence in performing this duty.
For a proper understanding of this element of the plaintiff’s claim, a rather detailed account of the relations between the plaintiff and the Quartermaster Corps of the Army will be necessary.
During World War II, the plaintiff manufactured large quantities of heaters under contracts with the Quartermaster Corps of the Army. After the war, the plaintiff continued to produce various kinds of heaters on a reduced scale under contracts with the Quartermaster Corps. Up until 1949, however, none of the plaintiff’s contracts with the Quartermaster Corps covered the production of portable gasoline tent heaters. •
As a result of the plaintiff’s activities for the Quartermaster Corps mentioned in the preceding paragraph, the plaintiff’s officers became well acquainted with personnel assigned to the Chicago Quartermaster Purchasing Office and with personnel of the Research and Development Laboratories maintained by the Quartermaster Corps at the Jeffersonville:, Indiana, Quartermaster Depot. Jefferson-ville is situated just across the Ohio River from Louisville.
. While visiting the Chicago Quartermaster Purchasing Office in the latter part of 1948, the plaintiff’s president, Ernest L. Vogt, learned from the director of procurement at that office that the Quartermaster Corps desired to expand the source of supply for portable gasoline tent heaters, and that the plaintiff would be welcomed as a bidder in connection with any future procurement of the item. Such a heater had been developed and manufactured exclusively by The Herman Nelson Corporation of Moline, Illinois, for the Army Air Forces during World War II under a speci*691fication (AAF Specification No. 40317-C (6 Nov. 1942), as amended by Amendment No. 3 (14 Sept. 1944)) which required that the heater be capable of producing 250,000 B.T.U.’s per hour; and in the fall of 1948, the Quartermaster Corps had entered into a further contract with The Herman Nelson Corporation for 243 portable gasoline tent heaters to be used by the Army. However, the Quartermaster Corps was not entirely satisfied with The Herman Nelson Corporation as the sole supplier of portable gasoline tent heaters, because of the high price charged by that company, because variations in the product supplied by that company created a problem with respect to the interchangeability of parts, and because that company had refused or failed to furnish to the Government a set of drawings of its heater. Statements along this line were made to the plaintiff’s president on the occasion of his visit to the Chicago Quartermaster Purchasing Office late in 1948.
The plaintiff was intérested in the possibility of manufacturing portable gasoline tent heaters for the Army, and it undertook to investigate the feasibility of such a project.
Upon learning that two of the Herman Nelson heaters were located at the Chicago Quartermaster Purchasing Office, Alvin R. Vogt, the plaintiff’s vice president and purchasing officer, went to Chicago early in 1949 and inspected the heaters. One of the heaters was disassembled, so that the various parts could be easily examined.
Sometime in March or April of 1949, Alvin R. Vogt, accompanied by the plaintiff’s plant manager, visited the Jef-fersonville Research and Development Laboratories of the Quartermaster Corps. At that time, several Herman Nelson portable gasoline tent heaters, which had been modified in various ways as part of an experimental program designed to improve the performance of this type of heater for Army use, were being tested. The plaintiff’s representatives were permitted to look at the modified heaters, and one of them was turned over and the bottom cover was removed in order that the plaintiff’s representatives might make a better inspection of the heater’s interior construction. In addition, the plaintiff’s representatives were shown a Herman Nelson *692heater which had not been modified and which was then being operated to provide heated air for laundry equipment.
During the course of the visit to the Jeffersonville Research and Development Laboratories mentioned in the preceding paragraph, the plaintiff’s representatives obtained a copy of War Department Technical Manual 10-1621, dated January 1944, which had been prepared by The Herman Nelson Corporation for use in maintaining and repairing the portable gasoline tent heaters manufactured by that company for the Army Air Forces. The manual contained a photograph of a Herman Nelson heater, photographs of all the parts included in the heater, maintenance and service instructions, and a parts list.
The plaintiff’s representatives gained the impression, in talking with personnel of the Research and Development Laboratories at Jeffersonville on the occasion of the visit previously referred to, that any future procurement of portable gasoline tent heaters by the Quartermaster Corps would involve the duplication of the Herman Nelson heater described in Technical Manual 10-1621, and that a future contractor could obtain from the Jeffersonville Research and Development Laboratories a sample heater to be copied in the manufacturing process. The specific details of the conversations between the plaintiff’s representatives and personnel of the Research and Development Laboratories cannot be reconstructed accurately at this late date, because the present-day recollections of persons who participated in the conversations differ as to what was said. Consequently, it is not known whether the impression of the plaintiff’s representatives, as outlined in the first sentence of this paragraph, was based upon a correct understanding or upon a misunderstanding of what was actually said by personnel of the Quartermaster Corps assigned to the Research and Development Laboratories.
It is unnecessary, however, to resolve this uncertainty. Even if the proof clearly showed that the personnel of the Jeffersonville Research and Development Laboratories stated unequivocally to the plaintiff’s representatives that any future procurement, of portable gasoline tent heaters would involve the duplication of the Herman Nelson heater described *693in Technical Manual 10-1621 and that a future contractor could obtain from the Jeffersonville Laboratories a sample heater to be copied, such a statement could not be regarded as imposing upon the Government a contractual duty to furnish a sample heater to the plaintiff.
In the first place, the personnel of the Jeffersonville Research and Development Laboratories was not authorized to speak for, or to act on behalf of, the Quartermaster Corps in connection with the making of contracts for the procurement of quartermaster items. Such authority, for the region with which we are concerned, was vested in the personnel of the Chicago Quartermaster Purchasing Office. An officer nr agent of the Government cannot bind the Government with respect to matters beyond the limits of his authority (Fansteel Metallurgical Corp. v. United States, 145 Ct. Cl. 496 (1959), 172 F. Supp. 268, 270); and any person dealing with an officer or agent of the Government must be held to have had notice regarding the limits of his authority (see Wilber Nat. Bank v. United States, 294 U.S. 120, 123-124 (1935)).
In the second place, the conversations that we are discussing occurred a month or two before the Chicago Quartermaster Purchasing Office issued the invitation for bids that led to the making of the contract which is involved in the present litigation, and such conversations .were of an exploratory nature instead of being pointed toward a pending business proposal. That being so, the conversations must be disregarded in fixing the rights and obligations of the parties under the contract. See American Crystal Sugar Co. v. Nicholas, 124 F. 2d 477, 479 (10th Cir., 1941).
The invitation for bids was issued by the Chicago Quartermaster Purchasing Office under the date of May 18, 1949, to a number of firms, including the plaintiff. Item No. 1 of the invitation related to the procurement of “heatees, TENT, gasoline; in accordance with AAF Specification 40317-C, dated 6 November 1942, and Amendment- 3, dated 14 September 1944, with exceptions as set forth on Schedule ‘B’.” Many deletions from, additions to, and changes in the provisions of AAF Specification No. 40317-C, as previously amended by Amendment No. 3, were provided for on Sched*694ule “B” of the invitation for bids and on continuation sheets that were attached to that schedule. Item No. la of the invitation for. bids called for “Cost of bidder’s recommended first and second echelon tools and spare parts t.o accompany Heaters, Tent, Gasoline, in the form of a kit.”
AAF Specification No. 40317-C, as revised by the invitation for bids,..was a. performance type of specification. Basically, the specification called for a portable gasoline tent heater that would be capable of producing continuously not less -than 250,000 B.T.U.’s per hour. It was not required that the heater conform to any particular design prescribed by the Quartermaster Corps, and there was nothing in the invitation for bids that could be interpreted as constituting a commitment on the part of the Quartermaster Corps that it would provide the successful bidder with a sample heater to be copied in the manufacturing process.
On June 4, 1949, the plaintiff submitted a bid in response to. the invitation for bids dated May 18, 1949. ■ The plaintiff’s bid was prepared on the copy- of the invitation which the plaintiff had received. In its bid, the plaintiff offered to furnish the heaters referred to in item No. 1 of the invitation at unit prices that ranged from $618.95 to $643 (the variations being based on the different places specified for delivery), and to furnish the kits of first and second echelon tools and spare parts (item No. la) at a price of $44.66 per kit. The plaintiff typed the following statement on the bid form in connection with item No. 1 of the invitation relating to the heaters:
Our bid is based on a duplication of the Herman Nelson Heater taken from the War Department Technical Manual 10-1621 dated Jan 1944 and from a Jefferson-ville Depot sample heater.
. The bids submitted in response to the invitation, including the plaintiff’s bid, were opened and reviewed at the Chicago Quartermaster Purchasing Office on June 6, 1949. The plaintiff’s bid was the lowest one submitted in response to the invitation. However, in view of the typed statement which the plaintiff had added in connection with item No. 1, the contracting officer was doubtful whether the plaintiff’s bid was responsive to the invitation. - .The contracting officer directed *695one of his subordinates to call the plaintiff on the long-distance telephone and discuss this matter. The telephone call was received by the plaintiff’s president, who assured the representative of the contracting officer that it was" the plaintiff’s intention, if it received the award, to furnish heaters that would fully meet all the requirements set out in the pertinent specification. The plaintiff’s, president was requested to confirm this oral statement in writing. Thereupon, the following letter was written on behalf of the plaintiff to the Chicago Quartermaster Purchasing Office, under-the date of June 6,1949:
In accordance with our telephone conversation of this afternoon regarding our bid *■ * * -for heaters, -TENT, gasoliNE, we are pleased to confirm, that said .bid is in accordance with Government Specifications 5 in all respects. ■
Furthermore, the spare parts will conform- to. the existing break downs of manufactured and purchased parts and will therefore be interchangeable with the existing Herman Nelson heaters. . ;. ...
After a survey of the plaintiff’s plant and finances had been made, the contracting officer notified the plaintiff by means of a letter dated June 24, 1949, that its bid had. been accepted. The formal contract was dated June .24,1949, and was numbered W 11-183-qm-8180. It was transmitted- on July 13, 1949, by the Chicago Quartermaster Purchasing Office to the plaintiff for signature, and it was signed by the plaintiff on July 19,1949.
Item No. 1 of contract W 11-183-qm-8180 (which will usually be referred to hereafter in the opinion as “the contract”) covered the furnishing of 312 “heaters, tent, gasoline ; in accordance with AAF Specification 40317-C, dated 6 November 1942, and Amendment 3, dated 14 September 1944, with exceptions as set forth herein.” The exceptions specified in the contract consisted of the same deletions from, additions to, and changes in AAF Specification-No. 4031T-C, as previously amended by Amendment No. 3, that were referred to in the invitation for bids. The plaintiff’s bid (which, as previously indicated, was prepared on a copy of the invitation for bids.) and the plaintiff’s letter of June 6, *6961949, previously quoted in this opinion, were incorporated in and made part of the contract by reference.
In considering whether the contract of June 24, 1949, required the Government to furnish a sample heater to the plaintiff for use as a model in the manufacture of heaters under item No. 1 of the contract, it can be stated at the outset that none of the provisions of the contract, with the possible exception of the plaintiff’s typed statement that “Our bid is based on a duplication of the Herman Nelson Heater taken from War Department Technical Manual 10-1621 dated Jan 1944 and from a Jeffersonville Depot sample heater” (emphasis supplied), imposed such a duty upon the Government, either expressly or by implication. With respect to the plaintiff’s typed statement, the language used by the plaintiff certainly did not state clearly that the Government was to furnish a sample heater to the plaintiff. Indeed, it would be difficult to find such a specific requirement in the ambiguous phrase “from a Jeffersonville Depot sample heater.” A party who drafts a contract provision with the intention of imposing a specific duty on the other party must use clear lánguagó to accomplish his purpose. It is well settled that ambiguities in a contract provision prepared by one Of the parties will be resolved against the party preparing the provision and in favor of the other party to the contract. Standard Rice Co., Inc. v. United States, 101 Ct. Cl. 85, 95 (1944), affirmed 323 U.S. 106; Wunderlich Contracting Co. v. United States, 143 Ct. Cl. 876, 878 (1958). Therefore, it would be improper in the present case to favor the plaintiff by interpreting the plaintiff’s ambiguous typed statement as imposing upon the Government a specific requirement that it furnish a sample heater to the plaintiff.
The plaintiff, however, wrote a letter to the Chicago Quartermaster Purchasing Office on June 27, 1949, requesting that a sample heater be made available to the plaintiff. As the plaintiff had not, as of July 8, 1949, received a response to its letter of June 27, the plaintiff’s president went to Chicago on July 8 and conferred with the.contracting officer and other personnel of the Chicago Quartermaster Purchasing Office concerning the plaintiff’s desire for a sample Herman Nelson heater to be copied in manufacturing the heaters under *697item No. 1 of the contract. The contracting officer initially took the position that since the contract did not impose any requirement that a Herman Nelson heater be duplicated, there was no need to furnish a sample Herman Nelson heater to the plaintiff. However, after discussing the matter with the plaintiff’s president, the contracting officer said that it would be satisfactory with the Government for the plaintiff to duplicate a Herman Nelson heater, so long as the end product complied in all respects with the requirements of AAF Specification No. 40317-C, as revised by the invitation for bids and the contract. Thereupon, the Chicago Quartermaster Purchasing Office arranged for one of the latest Herman Nelson heaters to be shipped on July 8, 1949, from the Columbus, Ohio, Quartermaster Depot to the Jeffersonville Quartermaster Depot for delivery to the plaintiff. The plaintiff obtained the sample Plerman Nelson heater from the Jeffersonville Depot on July 13,1949.
Under the interpretation of the contract previously set out in this opinion, the action of the Government in furnishing a sample Herman Nelson heater to the plaintiff at'the time indicated in the preceding paragraph was a gratuitous act done for the benefit of the plaintiff, rather than an act done in compliance with a requirement of the contract. That being so, the plaintiff does not have any legal basis for a complaint relative to the Government’s delay until July 13,1949, in furnishing a sample heater to the plaintiff. B-W Construction Co. v. United States, 97 Ct.Cl. 92, 122 (1942).

Fan

The plaintiff also complains that its manufacturing operations were delayed because of a failure on the part of the contracting officer to make a reasonably prompt determination regarding the type of fan that was to be used in the heaters manufactured under item No. 1 of the contract.
The Herman Nelson heaters which the plaintiff’s representatives had observed in Chicago during the early part of 1949 and in Jeffersonville during March or April of 1949 were equipped with a 3-blade Torrington steel fan, and this type of fan was depicted in Technical Manual 10-1621 as being the. appropriate fan for the portable gasoline tent *698heater described in the manual. When the plaintiff submitted its bid on the manufacture of heaters and kits of spare parts, the plaintiff expected, if it received the award,, to duplicate the Torrington steel fan in its plant, to equip the heaters with such fans, and to supply one of these fans as a spare part in each spare parts kit. The Torrington fan was expressly mentioned in the plaintiff’s bid on item' No. la as one of the spare parts to be furnished in each kit.
When the contract pf June 24, 1949 (which incorporated the plaintiff’s bid by.reference) was entered into, it required the plaintiff under item No. la to supply Torrington steel fans as spare parts in the spare parts kits that were to accompany the heaters manufactured under item No. 1 of the contract. With respect to item No. 1, the plaintiff’s typed statement that its bid was “based bn a duplication of the Herman Nelson Heater taken from the War Department Technical Manual 10-1621 dated Jan 1944,” and the incorporation of this statement in the contract by reference, perhaps amounted to a contract provision'that the heaters manufactured under item No. 1 of the contract would be equipped with Torrington steel fans, since the Torrington steel fan was depicted in Technical Manual 10-1621 as a component of the portable gasoline tent heater described in the manual. In any event, the evidence warrants an inference that the use of the Tor-rington steel fan as a component of the heaters to be manufactured by the plaintiff under item No. 1 of the contract would have been entirely satisfactory to the Quartermaster Corps during the early stages of the life of the contract. The Quartermaster Corps at the time was mainly interested in the performance characteristics of the heaters, rather than in the specific details of their design and equipment.
As indicated in the previous discussion under the heading of “Sample Heater,” the Quartermaster Corps furnished a sample Herman Nelson heater to the plaintiff on July 13, 1949, at the plaintiff’s request and as a convenience to the plaintiff. When the sample Herman Nelson heater was examined in the plaintiff’s plant, it was found to be different in certain important respects from the Herman Nelson heaters which the plaintiff’s representatives had examined in Chicago during the early part of 1949 and in Jeffersonville *699during March, or April of 1949, and from the Herman Nelson heater depicted in Technical Manual 10-1621. One of these differences related to the heater fan.
The sample Herman Nelson heater was equipped with a 4-blade aluminum fan, instead of the 3-blade Torrington steel fan. The blades of the two types of fans were shaped differently; and the hub that had been provided on the sample Herman Nelson heater for the aluminum fan was about 3 inches longer than the hub that had been provided for the Torrington fan on the Herman Nelson heaters previously examined by the plaintiff’s representatives. It was not feasible for the plaintiff to duplicate in its plant the aluminum fan that was on the sample heater. Moreover; the fan on the sample heater had the word “Patented” stamped on it. The Torrington- fan could not be used with the long fan-hub on the sample heater.
Alvin it. Vogt went to Chicago on August 12, 1949, and, in the absence of the contracting officer, he discussed with another official of the Chicago Quartermaster Purchasing Office the matter of the discrepancies between the sample heater and the Herman Nelson heaters which the plaintiff’s representatives had previously seen in Chicago and Jef-fersonville. At the conclusion of the discussion,- an agreement was reached between Mr. Vogt and the official of the Chicago Quartermaster Purchasing Office to the effect that the plaintiff, in manufacturing heaters under item No. 1 of the contract, would duplicate the Herman Nelson heater that had been furnished to the plaintiff by the Quartermaster Corps on July 13, 1949. ' This agreement was confirmed by means of a letter dated August 18, 1949, from the plaintiff to the Chicago Quartermaster Purchasing Office, in which the plaintiff expressed the understanding that the heaters to be furnished under the contract were to be copies of the sample heater which the.plaintiff had received from the Quartermaster Corps on July 13, 1949. Subsequently, the contracting officer on September 12,1949, issued a formal change order, which was denominated modification “A” and which amended the contract by the inclusion of the following provision:
*700The supplies to be furnished under said contract shall be manufactured in strict accordance with specification requirements and exceptions called for therein, and
Sample Heater, Tent, Gasoline, made available to the contractor at Jeffersonville Quartermaster Depot, Jeffersonville, Indiana.
The agreement of August 12,1949, to the effect that the plaintiff, in manufacturing the 312 heaters called for by item No. 1 of the contract, would duplicate the sample Herman Nelson heater which the Quartermaster Corps had furnished to the plaintiff on July 13, 1949, necessarily included an agreement that the 312 heaters would be equipped with the same type of fan as the sample Herman Nelson heater, i.e., the 4-blade patented aluminum fan. Accordingly, the plaintiff undertook to locate a source of supply for the aluminum fan. Having learned that the patent on the aluminum fan was held by The Herman Nelson Corporation, the plaintiff, in a-letter dated August 13,1949, requested that company to quote a price on 624 Herman Nelson fans (for the 312 heaters and the 312 spare parts kits). The Herman Nelson Corporation replied on August 17', 1949, and said that the fan was not available for sale “except with other components.” Thereafter, the plaintiff removed the aluminum fan from the sample Herman Nelson heater and sent it to the Torrington Manufacturing Company with an inquiry as to whether that company could duplicate the fan for the plaintiff. A negative reply was received from the Torrington Manufacturing Company.
After encountering difficulty in its attempt to procure the patented Herman Nelson aluminum fan, the plaintiff wrote a letter to the "Chicago Quartermaster Purchasing Office on September 16, 1949. In this letter, the plaintiff brought up the point that item No. 1 of the contract, as modified by the agreement of August 12, 1949, required the plaintiff to produce heaters that were equipped with the Herman Nelson patented aluminum fan (since the heaters were to be duplicates of the sample heater), whereas item No. la of the contract; which related to the furnishing of kits of tools and spare parts to accompany the heaters, pro*701vided for*; the furnishing of a Torrington steel fan as a spare, part in- each kit. The letter then stated:
' Since the two fans are not interchangeable we must have a clarification as to which fan you-will want and whether you will want the spare fan to be the same as •the one furnished with the complete Heaters.
Although the plaintiff did not receive a reply to its letter of September 16, 1949, the- plaintiff was evidently, of the belief that the patented .Herman Nelson aluminum fan, if available, would be acceptable to the Quartermaster Corps for inclusion in'the spare parts kits, as well as for use in equipping the 312 heaters that were to be manufactured under the contract. This is indicated by the fact that in a letter dated October 4,1949, the .plaintiff requested The ,Herr man Nelson Corporation to reconsider its refusal to sell Herman Nelson fans to the plaintiff. The Herman Nelson Corporation replied On October 13,1949, and again declined to sell the fans to the plaintiff.
Alvin R' Vogt had a conference with the contracting officer in Chicago on November 4,1949. During the course of that conference, Mr. Vogt disclosed the difficulty that the plaintiff had encountered in attempting to procure the Herman Nelson fan.
Thus, it seems to be plain that the plaintiff’s real problem in connection with the fan did not arise from delay on the part of the contracting officer in clarifying an uncertain point as to what the contract required, but, rather, from the plaintiff’s inability to procure the patented Herman Nelson aluminum fan. In this, connection, it was the plaintiff’s responsibility to ascertain the availability of this particular component before agreeing, under the modification of the contract, to provide it as part of the heaters to be manufactured pursuant to the contract; and the plaintiff’s unforeseen difficulty in finding a supplier did not have any legal effect upon the rights and obligations of the parties under the contract, as modified. Quinn v. United States, 99 U.S. 30, 33 (1878); Columbus Ry. & Power Co. v. Columbus, 249 U.S. 399, 412 (1919).
The plaintiff on December 14, 1949, submitted to the Chicago Quartermaster Purchasing Office a formal proposal *702that the Torrington fan, with an adapter to fit it onto the long fan-hub provided for in the sample Herman Nelson heater, be used on the heaters manufactured under the contract, in lieu of the Herman Nelson fan with which the sample heater was equipped. In response to this'proposal, the contracting officer orally inquired of the plaintiff on or shortly before December 27,1949, as to whether the substitution of the Torrington fan for the Herman Nelson fan would involve any increase in the cost of the heaters. The plaintiff replied to this inquiry by means of a letter dated December 27, 1949, stating that the substitution- of the Torrington fan would not involve any additional charge' except for the adapter, and that the cost of the adapter would be $1.45 per unit, or a total of $452.40 for the adapters on S12 heaters.
A conference was held in Chicago on January 4, 1950, between representatives of the plaintiff and personnel of the Chicago- Quartermaster Purchasing Office, including the contracting officer. A number of problems that had arisen in connection with the performance of the contract were discussed at the conference. With respect to the problem of the heater fan, the contracting officer agreed that the Torrington fan, with adapter, could be used on the heaters manufactured under the contract, instead of the Herman Nelson fan with which the sample heater was equipped. Personnel of the Quartermaster Corps suggested that the fan adapter, as proposed by the plaintiff, should be revised in certain minor respects, and the plaintiff acquiesced. It was agreed that the extra charge for the fan adapter, as thus modified, would be $1.60 per unit. .
With respect to the proposal of December 14, 1949, that item No. 1 of the contract, as modified by the agreement of August 12, 1949, be further modified to provide for the use of the Torrington fan, with adapter, on the heaters to be manufactured under the contract, it will be noted that this was a change proposed by the plaintiff. It was not something desired by the Government. The contracting officer was not under any implied legal obligation to act with due diligence in passing on a proposal made by the plaintiff for a change in the contract. B-W Construction Co. v. United States, supra, at p. 120. Moreover, even if such an implied legal obligation had existed, it appears that the period from *703December 14, 1949, until January 4, 1950, was not an unreasonably long one for the consideration and disposition of this proposal.
It is my opinion, therefore, that there was no breach of contract on the part of the Government in connection with the matter of the fan.

Wheels

A problem somewhat similar to that of the heater fan arose in connectionwith the heater wheels.
The Herman Nelson heaters which the plaintiff’s representatives had examined prior to the issuance of .the invitation for bids were equipped, and the. Herman Nelson heater depicted in Technical Manual 10-1621 was shown to be equipped, with steel wheels that had metal treads and no ball bearings. The plaintiff had the necessary facilities in. its plant to duplicate such wheels and intended to do so if a heater contract was obtained. However, the wheels on the sample Herman Nelson heater which the plaintiff received from the Quartermaster Corps on July 13, 1949, had ball bearings and semi-pneumatic rubber tires. It was not feasible for the plaintiff to make rubber-tired wheels with ball bearings.
After it was agreed at the conference on August 12, 1949, that the plaintiff would duplicate the sample Herman Nelson heater, the plaintiff endeavored to find a source of supply for wheels of the type on the sample heater. This effort was unsuccessful. However, the plaintiff in December 1949 did locate a. source of supply for a wheel that was similar to the wheels on the sample heater, except that the former had a wider hub than the latter.
On December 14, 1949, the plaintiff proposed to the contracting officer that the wheel with the wider hub be used on the heaters to be manufactured under the contract, in lieu of the type of wheel with which the sample heater was equipped. The contracting officer inquired orally on or shortly before December 27, 1949, whether the wheel substitution proposed by the plaintiff would increase the. cost of the heaters; and the plaintiff informed the contracting officer in a letter dated December 27, 1949, that no change in the contract price would be involved in connection with *704the wheel item. At the conference in Chicago on January 4, 1950, previously mentioned in the discussion under the heading of “Fan,” the plaintiff was informed by the contracting officer that its proposal regarding the wheel substitution was approved.
The wheel problem arose from the plaintiff’s difficulty in. finding a supplier of the wheel that it was supposed to use-in equipping the heaters under item No. 1 of the contract, as modified by the agreement of August 12, 1949, rather than from anything that was done by the Government. Furthermore, when the matter of making a change in the contract requirement relative to the wheel was raised by the plaintiff with the contracting officer on December 14, 1949, the contracting officer did not unreasonably delay his consideration and disposition of the plaintiff’s request.
It appears, therefore, that the Government is not chargeable with any breach of contract in connection with the matter of the wheels.

Mechanical Endurance and Cold Tests

The plaintiff contends that the contracting officer unreasonably delayed the granting to the plaintiff of a waiver from the requirements of the contract on the subject of mechanical endurance and cold tests.
Paragraph F-8b of AAF Specification No. 40317-C, as added by the invitation for bids, provided that a representative heater produced under the contract should be subjected to a 1,000-hour operational test; and paragraph F-3c of the specification, as added by the invitation for bids, provided that a representative heater should be exposed to a temperature of —65° Fahrenheit for a specified period of time. However, paragraph H-4 of the specification, as added by the invitation for bids, provided that “The mechanical endurance test, and the cold tests shall not be required of a contractor who proposes to furnish a model accepted by the Procuring Agency on current or previous contracts as meeting the preferred requirements of this specification * *
. It will be recalled that the parties reached an agreement on August 12,1949, to the effect that the plaintiff, in manu*705facturing heaters under the contract, would duplicate the sample Herman Nelson heater which the Quartermaster. Corps'had furnished to the plaintiff on July 13, 1949. * Subsequently, in a letter dated October 24, 1949, to the Chicago Quartermaster Purchasing Office, the plaintiff called attention to the fact that it would duplicate the sample, heater, and requested a waiver of the mechanical endurance and cold tests.
As the plaintiff had not received a reply to its letter of October 24, Alvin K. Vogt discussed the matter of the mechanical endurance and cold tests with-the contracting officer at a conference in Chicago on November 4, 1949. Mr. Vogt stated to the contracting officer that the plaintiff was entitled to have the tests waived; but had not received a waiver.
The plaintiff was informed by means of a communication dated December 5, 1949, from the contracting officer that the plaintiff’s letter of October 24 had been forwarded to. the Office of the Quartermaster General for a decision, and .that “authority to waive test requirements under the contract * * * is not granted.”
■In a letter dated December 13,1949, to the Chicago Quartermaster Purchasing Office, the plaintiff asked for reconsideration of its request dated October 24,1949, fpr a waiver of the mechanical endurance and cold tests. The plaintiff subsequently raised the matter of obtaining a waiver of the mechanical endurance and cold tests at the Chicago conference on January 4, 1950, previously mentioned, in. a letter dated January 10, 1950, to the Chicago Quartermaster Purchasing Office, in a long-distance telephone conversation on January 23, 1950, with the chief of the Legal Branch of the Chicago Quartermaster Purchasing Office (the contracting officer was absent from the office at the time due to illness), in a letter dated January 27, 1950, to the Chicago Quartermaster Purchasing Office, in a long-distance telephone conversation on February 17, 1950, with personnel of that office, and in a letter dated February 21, 1950, to that office.
The plaintiff was informed on March 2, 1950, by means of a telephone call and a confirming telegram from the Chicago Quartermaster Purchasing Office, that the mechanical endurance and cold tests would not be required. This waiver *706was later provided for formally in modification “C” of the contract, which was issued in final form by the contracting officer on April 21 and accepted by the plaintiff on April 25, 1950.
Since the plaintiff was obligated, under the contract, as modified by the agreement, of August 12, 1949, to duplicate the sample Herman Nelson heater which had been furnished to the plaintiff by the Quartermaster Corps, the plaintiff obviously proposed “to furnish a model accepted by the Procuring Agency on current or previous contracts as meeting the preferred requirements of” the pertinent specification. Consequently, the plaintiff was entitled under paragraph H-4 of the specification to a waiver of the contract requirements respecting the mechanical endurance and cold tests..
The Government was under an implied obligation to act with due diligence in' considering and disposing of the plaintiff’s request of October 24,1949, for the waiver to which the plaintiff was entitled under the provisions of the contract. Peter Kiewit Sons' Co., Inc. v. United States, supra, at pp. 674-675. However, the plaintiff’s request was not handled with reasonable promptness. It was not until March 2, 1950—which was more than 4 months after the submission of the plaintiff’s request — that the plaintiff was informed of the granting of the waiver. It seems to me that this long delay should be regarded as a negligent failure to discharge the implied obligation that rested upon the Government to render with due diligence a' service to which the plaintiff was entitled.

Stellite Vahe

The Herman Nelson heaters which representatives of the plaintiff examined prior to the' issuance of the invitation for bids were equipped, and the Herman Nelson heater depicted in Technical Manual 10-1621 was shown to be equipped, with a Briggs & Stratton engine that had a standard exhaust valve. The plaintiff, in submitting its bid, intended to equip the heaters manufactured under item No. 1 of the contract with Briggs & Stratton engines, if it received the award; and the plaintiff offered to provide a standard exhaust valve as a spare part in each kit of tools and spare parts to be furnished under item No. la of the contract.
*707Accordingly, the plaintiff, after receiving the award, got in touch with the Briggs & Stratton Corporation and asked for a quotation on Briggs & Stratton engines to be used in the heaters under item No. 1 of the contract, and for a quotation on standard exhaust valves to be included in the kits of tools and spare parts under item No. la of the contract. . The Briggs & Stratton Corporation informed, the plaintiff that the engines which it had furnished to The Herman Nelson Corporation for use in connection with the more recent production of portable gasoline tent heaters were not equipped .with standard exhaust valves but with exhaust valves made of Stellite, an extra-hard, heat-resistant metal.
The availability of the superior Stellite exhaust valve was called to the attention of the contracting officer by the plaintiff’s president at a conference in Chicago on July 8, 1949. The contracting officer stated that the matter would be investigated by the Quartermaster Corps.
On July 11, 1949, the plaintiff received a telephone call from the Chicago Quartermaster Purchasing Office. The latter requested a quotation on the price differential between the Stellite exhaust valve and the standard exhaust valve for the spare parts kits. The plaintiff replied to this inquiry by means of a letter dated July 11, 1949, stating that the substitution of the Stellite exhaust valve for the standard exhaust valve in the kits of spare parts would involve a net price increase of $5.70 per kit.
. As indicated earlier in the opinion, the plaintiff received a sample Herman Nelson heater from the Quartermaster Corps on July 13, 1949; and it was agreed at the conference on August 12, 1949, that the plaintiff, in furnishing heaters under item No. 1 of the contract, would duplicate this sample heater. The sample Herman Nelson heater was equipped with a Briggs & Stratton engine that had a Stel-lite exhaust valve.
The question whether the exhaust valves for inclusion in the kits of tools and spare parts under item No. la of the contract were to be Stellite valves or standard valves was discussed at the conference on August 12, 1949. The plaintiff was informed that the matter would be taken under advisement by the Quartermaster Corps.
*708In a letter dated August 23, 1949, the contracting officer informed the .plaintiff in part as follows:
It has been determined that an adequate supply of exhaust valves is on hand in army storage, and it is, therefore, proposed that the item of one * * * exhaust valve * * * be deleted from the list of items to be furnished as a Kit.
- Information is desired as to whether or not it is agreeable to your company that such deletion be made by modifying the contract with a proper adjustment in cost of contract * * *.
The plaintiff replied on September 16, 1949, and indicated that it would agree to the deletion of the exhaust valves from the spare parts kits and to a downward adjustment of $1.50 each in the price of the spare parts kits under item No. la, provided the Government would agree to increase the price of the heaters under item No. 1 by $5.70 each in view of the use in the heaters of Briggs & Stratton engines equipped with Stellite exhaust valves.
With respect to the condition which the plaintiff sought to impose in its letter of September 16, 1949, it may be observed that the plaintiff had already, by virtue of the August 12 agreement, made a commitment to furnish heaters that .were equipped.with Briggs.& Stratton engines having Stel-lite exhaust valves. The plaintiff did not request any adjustment in the contract price for the heaters at the time of making the agreement.
The matter of the exhaust valve was discussed by Alvin E. Vogt with the contracting officer at a conference in Chicago on November 4, 1949. The contracting officer again stated that the Quartermaster Corps had on hand numerous Stel-lite exhaust valves that would fit the heater engines and that, as a saving to the Government, the Quartemiaster Corps was prepared to furnish these Stellite exhaust valves for the spare parts kits and to delete the requirement under item No. la for the plaintiff to furnish standard exhaust valves as spare parts.
At the conference in Chicago on January 4, 1950, previously mentioned in other parts of the opinion, it was agreed by the plaintiff and the contracting officer that the requirement under item No. la of the contract for the *709furnishing by the plaintiff of standard exhaust valves in the spare parts kits would be deleted, and that the Quartermaster Corps would provide 312 Stellite exhaust valves to the plaintiff for inclusion in the spare parts kits. Later, this agreed ment was supplemented by a further agreement on January 13,1950, whereby the price for the spare parts kits was to be reduced to the extent of $1.50 each because of the change mentioned, but the plaintiff was to be entitled to collect a service charge of 75 cents per unit in connection with the handling of the Stellite valves that were to be furnished by the Quartermaster Corps for inclusion in the spare parts kits.
With respect to this phase of the case, we have a situation where the plaintiff thoughtfully informed the contracting officer on July 8, 1949, regarding the availability of the superior Stellite exhaust valve and, by implication, suggested that such a valve be included in each spare parts kit in lieu of a standard exhaust valve; and the contracting officer made a counterproposal on August -23, 1949, that item No. la of the contract be modified by eliminating the requirement for the furnishing by the plaintiff of exhaust valves in the spare parts kits. The delay of about 1 y2 months by the contracting officer in taking any sort of position on the matter may have been a discourtesy to the plaintiff, but the plaintiff was equally remiss in failing to respond to the counterproposal for several months, except by way of an unjustified attempt to utilize it as a means for securing an upward adjustment in the contract price for the heaters without any consideration. However, neither the plaintiff nor the contracting officer was under any legal obligation to accept the other’s proposal for a change in the requirements of the contract, or even to exercise due diligence in responding to such a proposal. B—W Construction Co. v. United States, supra, at p. 120. In any event, both parties contributed to the delay in the final solution of the problem of the exhaust valve, and this court will not undertake to apportion the responsibility for the delay in such a situation. Greenfield Tap & Die Corp. v. United States, 68 Ct. Cl. 61, 76 (1929), cert. denied 281 U.S. 737; Coath & Goss, Inc. v. United States, 101 Ct.Cl. 702, 714-715 (1944).

*710
Radio Suppression System

In a letter dated November 28, 1949, and addressed to the plaintiff, the contracting officer mentioned that a new radio suppression system for engines of the type that were to be used in the portable gasoiine tent heaters had recently been developed, and that the new system was superior to the one on the engine in the sample Herman Nelson heater which the plaintiff was to duplicate under item No. 1 of the contract. The contracting officer inquired whether— and if so at what cost — the contract could be modified so as to provide for the use of this improved system on the heater engines. The plaintiff replied by means of a letter dated December 17, 1949. In its reply, the plaintiff implied that it would have no objection to the proposal for a change with respect to the radio suppression system, but did not quote a price to the Quartermaster Corps.
On December 22, 1949, the contracting officer wrote another letter to the plaintiff, asking that the plaintiff “advise to what extent the contract value would be affected by this change.”
On December 27, 1949, the contracting officer telephoned to the plaintiff and asked for a quotation on the price increase that would be involved in making the proposed change to the newer type of radio suppression system, but the plaintiff was unable to quote a price at that time.
The substitution of the improved radio suppression system was discussed at the Chicago conference on January 4,1950, mentioned earlier in the opinion. At that conference, the •plaintiff stated that the change could be made on the basis of á $16.65 increase in the price of each heater under item No. 1 of the contract, and a net increase of $13 per kit for the radio suppression components provided as spare parts under item No. la of the contract.
On January 23, 1950, the plaintiff was notified by the contracting officer that the improved radio suppression system was to be used on the heater engines, that components of the improved system were to be furnished in the spare parts kits, ■and that appropriate changes were to be made in the prices ■of the heaters and spare parts kits. This change was subsequently incorporated in modification “C” of the contract.
*711The uncertainty from November 28, 1949, until January 23, 1950, over whether the improved radio suppression system was to be used on the heater engines, and whether components of the improved system were to be included in the spare parts kits, was due principally to the plaintiff’s delay until January 4, 1950, in informing the contracting officer regarding the extent of the increase in the contract price that would be involved if the change were made. Therefore, the plaintiff does not have any legal basis for a complaint against the Government with respect to this matter. :

Paint

Paragraph G-5.3.4 of AAF Specification No. 40317-C, as amended, provided that both the inside and outside of all containers should be covered with one coat of “lusterless olive-drab paint complying with Federal Specification TTP-81.” However, in attempting to procure supplies for the performance of the contract, the plaintiff discovered that olive-drab paint which complied with Federal Specification TT-P-81 was not lusterless. ' -
On December 14, 1949, the plaintiff proposed to the Chicago Quartermaster Purchasing Office that paragraph G-5.3.4 of the pertinent specification be changed by striking out the word “lústerless.” This letter was supplemented by a further communication from the plaintiff under the date of December 27, 1949, in which the plaintiff stated that the proposed change would not affect the contract price.
The contracting officer informed the plaintiff in a letter dated December 28, 1949, that the plaintiff’s proposal with respect to the container finish had been disapproved. The contracting officer proposed that the word “lusterless” should be interpreted to mean that the containers should have a lusterless appearance when dried after an application of one coat of olive-drab paint complying with Federal Specification TT-P-81.
The matter of the container finish was discussed at the Chicago conference on January 4, 1950, previously mentioned. It was agreed by the contracting officer at the conference that paragraph G-5.3.4 of the specification would be amended by deleting the word “lusterless,” as proposed by the plaintiff.
*712When the contradiction contained in the paragraph of the specification relative to paint was called to the attention of the contracting officer, he had, under legal principles previously discussed, an implied obligation to act with due diligence in clarifying this matter. However,- the delay from December 14, 1949, until January 4, 1950, does not appear to have been of such an unreasonable length as to- constitute a breach of this implied obligation.
It is my opinion, therefore, that the matter of the paint does not provide any legal basis for a claim by the plaintiff against the Government.

Combustion Chamber Steel

The top and bottom of the combustion chamber in the sample Herman Nelson heater which the plaintiff was to duplicate under the agreement of August 12,1949, were made of stainless steel .025 inch in thickness. When the plaintiff endeavored to procure steel with which to fabricate the combustion chambers that were to be used in the heaters manufactured under the contract, the plaintiff discovered that •025-inch steel, although a normal commercial gauge, was not obtainable on the market at the time because of a steel shortage resulting from a strike in,the steel industry. However, the plaintiff was able to obtain stainless steel that was .0375 inch in thickness. • .
On October 20, 1949, a representative of the plaintiff discussed this matter with personnel' of the Research and Development Laboratories at Jeffersonville. After the conversation, the plaintiff on the same day wrote a letter to the Research and Development Laboratories stating that it was the plaintiff’s intention to use .0375-inch steel in the fabrication of the top and bottom of the combustion chamber, and asking that the plaintiff be notified at once if there was any objection to the proposal. Apparently, the plaintiff’s letter of October 20, 1949, was not forwarded by the-Jeffersonville Laboratories to the contracting officer for consideration.
• By means of a letter dated December 14,1949, the plaintiff submitted to the contracting officer, through appropriate channels, a. proposal that- .0375-inch stainless steel be used in fabricating the top and bottom of the combustion chamber,
*713The contracting officer inquired of the plaintiff in a telephone conversation on December 27, 1949, as to whether the proposal regarding the combustion-chamber steel would involve any increase -in the contract price. The plaintiff stated in reply that the increased cost would be $2.26 per unit, or a total of $705.12 for the 312 units. •.
At the Chicago conference on January 4,1950, previously mentioned, it was agreed by the contracting officer that steel .0375 inch in thickness might be utilized at the plaintiff’s option for the top and bottom of the combustion chamber. No adjustment in the contract price was made on account of this change. •
With respect to the failure of the Jeffersonville Research and Development Laboratories to pass on to the contracting officer the plaintiff’s proposal of October 20,1949, that .0375-inch steel be substituted for the .025-inch steel called for under the contract, as modified by the agreement of August 12, 1949, it should be stated that the Jeffersonville installation was not, at the time, in the regular channel of communication between the plaintiff and the contracting officer with respect to problems arising in the performance of the contract. If the plaintiff wanted to propose a change in the contract, it was incumbent upon the plaintiff to submit its proposal to the contracting officer rather than to the Jeffersonville Research and Development Laboratories, which was not vested with any authority over contract matters. Anthony P. Miller, Inc. v. United States, 111 Ct.Cl. 252, 331 (1948); J. A. Ross & Co. v. United States, 126 Ct.Cl. 323, 329-330 (1953).
Furthermore, the change which the plaintiff proposed was for its own benefit, since the plaintiff’s problem in connection with the steel item was due to the difficulty of locating .025-inch steel in the market because of the steel strike. In such a situation, the contracting officer was not under any implied legal obligation to act with due diligence on the plaintiff’s proposal. B-W Construction Co. v. United States, supra, at p. 120. In any event, the contracting officer’s delay from December 14, 1949, until January 4, 1950, in acting on the plaintiff’s proposal was not unreasonably long.

*714
Fuel Tank

The sample Herman Nelson heater which the plaintiff' agreed to duplicate was equipped with a fuel tank that had’ a- soldered seam. However, when the plaintiff on September 17, 1949, submitted to the contracting officer for approval a drawing relative to the fuel tank, the drawing indicated that the proposed fuel tank would have a welded seam. This proposed modification was based upon a recommendation by a gas tank manufacturer and was intended to improve the durability of the tank. However, no'explanation was furnished by the plaintiff to the contracting officer at the time when the drawing was submitted.
On December 14, 1949, the plaintiff submitted to the contracting officer, through appropriate channels, a proposal that it be authorized to furnish a seam-welded fuel tank in lieu of the fuel tank with soldered seam on the sample Herman Nelson heater.
On December 27, 1949, the contracting officer telephoned! to the plaintiff and asked whether any increase in the contract price was involved in the proposal to substitute a'seam-welded fuel tank for the fuel tank with soldered seam. The plaintiff informed the contracting officer that no increase in the contract price would be involved, whereupon the contracting officer orally approved the proposed change.
In the first place, I do not believe that the submission on September 17, 1949, of the fuel-tank drawing which indicated a seam-welded tank, without any explanation by the-plaintiff, was sufficient to put the contracting officer on notice that the plaintiff was proposing a. change-in the contract. A proposal for a change in a contract must be-submitted in a sufficiently clear and formal way to put the other party on notice concerning it. Anthony P. Miller, Inc. v. United States, supra, at p. 331.
In the second place, with respect to the plaintiff’s proposal of December 14, 1949, to the contracting officer for a-, change in the contract requirement relative to the fuel tank, there was no implied legal obligation on the contracting-officer to act with due diligence on such a proposal submitted' by the plaintiff. B-W Construction Co. v. United States, supra, at p. 120.
*715In the third place, the contracting officer’s delay from December 14 until December 27 in acting on the plaintiff’s-proposal was not unreasonably long.

Gasket for Oleanout Cover

There were two cleanout holes in the combustion chamber of the sample Herman Nelson heater which was to be duplicated by the plaintiff under the contract, as modified by the agreement of August 12, 1949. Each hole was covered by a small circular metal plate called a cleanout cover, and each cleanout cover was fitted with a gasket made of woven material in the form of a solid circular disk.
On December 14, 1949, the plaintiff submitted to the contracting officer, through appropriate channels, a proposal that an asbestos gasket made in the form of a hollow circle be substituted for the type of gasket that was on the sample heater. In making this proposal, the plaintiff stated that the purpose was “To increase the thermal efficiency of the unit by making the cleanout cover available for heat transfer.” A drawing of the type of gasket which the plaintiff proposed to use was submitted with this recommendation.
On December 27, 1949, the contracting officer inquired of the plaintiff in a telephone conversation whether the plain-' tiff’s proposal concerning the cleanout cover gasket would involve any increase in the contract price. Upon receiving a negative reply from .the plaintiff, the contracting officer orally authorized the proposed change.
As indicated in other portions of the opinion, the contracting officer was not under any implied legal obligation to act with due diligence on a proposal made by the plaintiff for a change in the contract. However, even if there had been such an implied obligation resting on the contracting officer, the contracting officer’s delay from December 14 until December 27 in passing on the plaintiff’s proposal was not unreasonably long.

Burner Fuel Filter

The sample Herman Nelson heater which the plaintiff agreed to duplicate was equipped with a burner fuel filter, and the plaintiff intended to purchase this part for the heat*716■ers that were to be manufactured under item No. 1 of the contract. When-the plaintiff placed an order with the manufacturer for a supply of burner fuel filtei’s similar to the one -on the sample heater, the manufacturer informed the plaintiff that the particular model of the filter involved in the •order was outmoded, and that a later model was available.
On or about October 20, 1949, a representative of the plaintiff called the attention of the Jeffersonville Research a,nd Development Laboratories to the fact that the sample Herman Nelson heater was equipped with an outmoded burner fuel filter. At that time, however, the personnel at the Jeffersonville Laboratories was not in the authorized -channel of■ communication between the plaintiff and the -contracting officer with respect to problems arising in connection with the performance of the contract.
The matter of the burner fuel filter was discussed at the conference in Chicago on January 4,1950. It was agreed by the contracting officer at the conference that the plaintiff would be authorized to substitute the latest model of burner fuel filter in order to overcome obsolescence.
There is no competent evidence in the record that this matter of the burner fuel filter was ever raised by the plaintiff with the contracting officer prior to January 4, 1950. Since the plaintiff’s proposal respecting a change in the contract requirement was approved that same day, the contracting officer obviously acted with due diligence, even if it be assumed for the purpose of discussion that the contracting officer was under an implied obligation to proceed with duo -diligence in considering the plaintiff’s proposal for a contract change.

Preproduction Drawings

■' Another complaint made by the plaintiff relates to the •alleged failure of the contracting officer to clarify with reasonable promptness the requirements of the contract with respect to the submission of manufacturing drawings by the plaintiff.
As indicated in an earlier portion of this opinion, the pl ain-tiff’s president was informed by the director of procurement at the Chicago Quartermaster Purchasing Office during a, conversation in 1948 (which was long before the issuance *717of the invitation for bids with which we are concerned ini the present litigation) that one of the sources of dissatisfaction with the previous supplier of portable gasoline tent heaters was that such supplier had refused or failed to furnish to the Government a set of drawings of its heater. With, respect to this point, the director of procurement indicated to the plaintiff’s president that the Quartermaster Corps, needed to have a set of drawings of the portable gasoline tent heater in its files, and that, in connection with the next procurement of such a heater, the successful bidder would be required to furnish a set of drawings to the Quartermaster Corps prior to the completion of the contract.
When the invitation for bids that is involved in the present case was issued on May 18, 1949, it contained the following-provision (amongothers):
CONTRACT drawings : The successful bidder shall- furnish three (3) complete sets of reproducible manufacturing drawings and specifications for material and parts-for approval prior to commencement of production.
The plaintiff’s bid was submitted on the plaintiff’s copy of the invitation, and this document was then incorporated by-reference in the contract of June 24, 1949. Hence, the contract plainly required the plaintiff to furnish three “complete sets of reproducible manufacturing drawings * * * for approval prior to commencement of productioni” (emphasis supplied).
On August 5, 1949, the contracting officer wrote a letter to. the plaintiff asking “that the three (S) complete sets of reproducible manufacturing drawings * * *, when available, be directed to this office.”
The plaintiff evidently had not read, or at least had not. paid any particular attention to, the provision of the invitation for bids and of the contract on the subject of manufacturing drawings. Prior to the receipt of the letter dated' August 5,1949, the plaintiff had been under the impression,, on the basis of the conversation in 1948 between the plaintiff’s-president. and the director of procurement at the Chicago-Quartermaster Purchasing Office, that any manufacturing-drawings which might be required by the Quartermaster-Corps could be submitted at any time prior to the completion. *718óf the contract. However, in the absence of evidence of fraud, imposition, or special circumstances excusing the plaintiff’s failure to read or pay attention to the contract provision on the subject of manufacturing drawings, the plaintiff was fully bound by such provision despite the plaintiff’s lack of awareness of it. Upton, Assignee v. Tribilcock, 91 U.S. 45, 50 (1875); Hayes v. Travelers Ins. Co., 93 F. 2d 568, 571 (10th Cir., 1937).
After receiving the letter of August 5, 1949, from the contracting officer, the plaintiff got in touch with personnel of the Research and Development Laboratories at Jeffersonville and discussed the possibility of an arrangement whereby the drawings could be submitted piecemeal, as the plaintiff made ready to produce or procure the various components of the heater, in lieu of submitting three complete sets of drawings prior to the commencement of production. The plaintiff’s suggestion was referred by the Jeffersonville personnel to the Chicago Quartermaster Purchasing Office for consideration.
In a letter dated August 8, 1949, the contracting officer informed the plaintiff in part as follows:
This office has been informed that discussion has been held between your company and the Research and Development Laboratories at the Jeffersonville Quartermaster Depot concerning the advantages to be obtained in submission and approval of drawings * * * on a partial basis rather than at the time of availability of complete drawings and specifications.
This office will have no objection to processing drawings from time to time in an effort to expedite the handling of this contract. However, it is requested that such drawings be submitted on a sub-assembly basis and not on individual components thereof.
In accordance with the understanding that had been reached relative to the submission of drawings on a sub-assembly basis, the plaintiff mailed the first group of drawings to the Chicago Quartermaster Purchasing Office on August 15, 1949. These drawings covered the combustion chamber subassembly. Other drawings of subassemblies were submitted by the plaintiff to the contracting officer on September 17, on October 5, on November 4, on December 14, and on December 27, 1949.
*719The matter of the submission of drawings was discussed at the conference in Chicago on January. 4, 1950, previously mentioned. It was contended on behalf of the plaintiff that the Government’s purpose in obtaining the drawings of the portable gasoline tent heater would be served by the submission of the remainder of the drawings at any time prior to the completion. of the contract. As a result of the discussion, the contracting- officer agreed that the plaintiff would not be required to submit further drawings on a sub-assembly basis as work on the contract progressed, but that the plaintiff might submit the remainder of the drawings at its convenience, so long as they were furnished prior to the date of the final payment under -the contract.
The plaintiff seems-to contend in the present case that the contracting officer’ somehow breached the contract in failing to grant to the plaintiff at an earlier date than January 4, 1950, permission to submit manufacturing drawings at any time prior to the completion of the contract. This is a novel -theory.
As previously pointed out, the contract plainly required the plaintiff, to submit three complete sets of drawings for approval prior to the commencement of production. The contracting officer certainly would not have been chargeable with breach of contract if he had insisted that the plaintiff •comply fully with this requirement. In lieu of doing so, however, the contracting officer on August 8, 1949, granted permission for the plaintiff to submit drawings piecemeal on a subassembly basis, as the plaintiff made ready to produce or procure the various components of the. heater. Then, on January 4, 1950, the contracting officer granted permission for the plaintiff to delay the submission of the (remainder of the drawings until such time as might suit •the plaintiff’s convenience, so long as the process of furnishing the drawings was completed prior to the date of final payment under the contract.. These actions by the contracting officer were not breaches of the contract, but waivers of a contract requirement, granted for.the benefit of the plaintiff. Such actions do not provide any legal basis for a claim against the Government.

*720
Combustion Chamber Drawings.

The plaintiff asserts that, during the period prior to January 4, 1950, while the plaintiff was required to submit sub-assembly drawings to the contracting officer for approval prior to commencing production of the particular components, the contracting officer unduly delayed his consideration of drawings submitted by the plaintiff. The plaintiff’s contentions along this line will be considered in the present and succeeding portions of the opinion.
Under the date of August 15, 1949, the plaintiff submitted to the contracting officer, for approval, a series of 17 drawings relating to the combustion chamber of the sample Herman Nelson heater.
On September 22, 1949, the contracting officer mailed the combustion chamber drawings back to the plaintiff, with his approval. The drawings were received by the plaintiff on September 26,1949.
I do not believe that the Government acted with due diligence in delaying action on the combustion chamber drawings from August 15 until September 22, 1949. Therefore, it is my opinion that the Government breached the implied obligation that rested on it in this respect.

Cabinet Drawings

Sixteen drawings relating to the cabinet portion of the' sample Herman Nelson heater were transmitted by the plaintiff on September 17, 1949, to the contracting officer for approval.
The plaintiff was informed on October 5, 1949, that the cabinet drawings were incomplete and that additional drawings would have to be submitted.
The additional drawings of the cabinet were delivered to the contracting officer by a representative of the plaintiff on November 4, 1949.
On December 28, 1949, the contracting officer mailed the cabinet drawings, with his approval, to the plaintiff. The drawings were received by the plaintiff on January 3, 1950.
Even if the Government’s delay from September 17 until October 5, 1949, in informing the plaintiff that the cabinet *721drawings were incomplete should be regarded as a breach of the Government’s implied obligation to act with due diligence in considering the drawings submitted by the plaintiff for approval, the plaintiff compounded the situation by delaying from October 5 until November 4, 1949, in submitting the additional drawings that were requested. Therefore, as of November 4,1949, it apears that both parties had contributed to the overall delay with respect to the cabinet drawings.
From November 4 until December 28, 1949, however, the delay in connection with'the cabinet drawings was attributable solely- to the Government. I believe that this was an unreasonably long period and constituted a breach of the Government’s implied obligation to exercise due diligence in the consideration of drawings submitted by the plaintiff for approval.

Instruction Plate Drawings

The plaintiff was required to furnish to furnish 13 instruction plates as part of each heater supplied under the contract, and it was the intention of the plaintiff to purchase these plates rather than to fabricate them in its own plant. Drawings relative to the instruction plates, together with samples of such plates, were transmitted by the plaintiff under the date of October 5, 1949, to the contracting officer for approval.
Although the contracting officer had not approved the instruction-plate drawings at the time, the plaintiff went ahead sometime in the latter part • of October 1949 and ordered from a supplier instruction plates that would be in accordance with the drawings.
The instruction-plate drawings were mailed back to the plaintiff by the contracting officer, with his approval, on December 19, 1949.
Although the Government unduly delayed its consideration of the instruction-plate drawings, this does not provide any legal basis for a complaint by the plaintiff against the Government, since the plaintiff did not wait for approval before procuring the instruction plates.

*722
Burner Air Chamber Drawing

The plaintiff on October 5, 1949, mailed to the contracting officer a drawing relative to the burner air chamber in the sample'Herman Nelson heater. This drawing was received by the contracting officer on October 6, 1949.
The drawing mentioned in the- preceding paragraph was mailed back to the plaintiff by the contracting officer on October 21, 1949, with suggested revisions. A covering letter requested that this drawing be resubmitted with related drawings for the complete combustion air duct. The drawing and-letter were receivéd by the plaintiff on October 24, 1949.
A. revised drawing of the .burner air. chamber and the related drawings requested-by the contracting officer were submitted to the contracting officer by the plaintiff on November 4, 1949.
On December 16, 1949, the plaintiff was notified that the drawing for the burner air chamber ánd the related drawings had been approved.
It seems to me that the Governmént, in connection with the drawings mentioned in this part of the opinion, failed after November 4, 1949, to discharge its implied obligation to act with due diligence in considering drawings submitted by the plaintiff for approval.

Drawings of Miscellaneous Heater Components

On November 4, 1949, the plaintiff delivered to the contracting officer, for approval, approximately ,20 drawings of miscellaneous components in the sample- Herman Nelson heater.
On December 28, 1949, the contracting officer mailed the miscellaneous drawings back to the plaintiff, with his approval. The approved drawings were received by the plaintiff on January 3, 1950.
. It is my view that the Government’s delay from November 4 until December 28, 1949, in acting on the drawings of miscellaneous heater components was. of an unreasonable length and, therefore, constituted a breach of the Government’s *723implied obligation to act with due diligence in passing on drawings submitted by the plaintiff for approval.

Conclusion

For the reasons indicated in previous portions of this opinion, I believe that the plaintiff is entitled to recover on-certain elements of its claim. However, the evidence in the record on the subject of damages is not of such a nature as to permit a reasonably accurate determination to be made regarding the plaintiff’s ■ damages on the elements in. the claim that are to be allowed under this opinion. Therefore, it is recommended that the determination of the amount of recovery be reserved for further proceedings under Rule 38(c).
FINDINGS OF FACT

The Plaintiff

1. The plaintiff, Vogt Brothers Mfg. Co., is a corporation existing under the laws of the State of Kentucky. It maintains its office and plant in Louisville, Kentucky. At all times material to this litigation, the affairs of the corporation were conducted as a family business. Ernest L. Vogt served as president of the corporation, Alvin R. Vogt (brother of Ernest L. Vogt) served as vice president and purchasing officer, and C. Lyman Vogt (son of Ernest L. Vogt) served as treasurer.1
2. The plaintiff’s manufacturing activities are divided between two major divisions, a sheet metal division and a cast iron division. As a regular part of its business, the plaintiff has manufactured shower-bath stalls, lawn mowers, brooder stoves, precision machined parts, and miscellaneous metal speciality items in its sheet metal division; and it has manufactured reciprocating steam pumps, fire hydrants, gate valves, tapping sleeves and valves, and valves for waterworks in its cast iron division.
3. (a) During World War II, the plaintiff performed a number of contracts for Government agencies. The plain-tiff was particularly successful in manufacturing for the *724•Quartermaster Corps of the Army large quantities of outfit burners, pot type, to be used with field bake ovens. For its work in reducing the cost of manufacturing pot-type outfit burners during wartime, the plaintiff was awarded an Army-Navy “E”. The plaintiff also produced corrugated-can immersion heaters for the Quartermaster Corps during the war. Following the end of World War II, the plaintiff continued to produce various kinds of heaters on a reduced scale under contracts with the Quartermaster Corps. Up until 1949, however, none of the plaintiff’s contracts with the Quartermaster Corps covered the production of portable gasoline tent heaters.
(b) As a result of the plaintiff’s activities for the Quartermaster Corps of the Army mentioned in paragraph (a) of this finding, the plaintiff’s officers became well acquainted with personnel assigned to the Chicago Quartermaster Purchasing Office and with personnel of the Research and Development Laboratories maintained by the Quartermaster Corps at the Jeffersonville, Indiana, Quartermaster Depot. Jef-fersonville is situated just across the Ohio River from Louisville.

Preliminary Discussions Regarding Portable Gasoline Tent Heater

' 4. While visiting the Chicago Quartermaster Purchasing Office in the latter part of 1948, the plaintiff’s president learned from the Quartermaster Corps’ director of procurement in Chicago that the Quartermaster Corps desired to expand the source of supply for portable gasoline tent heaters, and that the plaintiff would be welcomed as a bidder in connection with any future procurement of the item. Such a heater had been developed and manufactured exclusively by The Herman Nelson Corporation of Moline, Illinois, for the Army Air Forces during World War II under a specification (AAF Specification No. 40317-C (6 Nov. 1942), as amended by Amendment No. 3 (14 Sept. 1944)) which required that the heater be capable of producing 250,000 B.T.U.’s per hour; and in the fall of 1948 the Quartermaster Corps had entered into a further contract with The Herman Nelson Corporation for 243 portable gasoline tent heaters to be used by the *725Army. However, the Quartermaster Corps was not entirely satisfied with The Herman Nelson Corporation as the sole supplier of portable gasoline tent heaters, because of the high price charged by that company, because variations in the product supplied by the Nelson company created a problem with respect to the interchangeability of parts, and because that company had refused or failed to furnish to the Government a set of drawings of its heater. Statements along this line were made to the plaintiff’s president on the occasion of his visit to the Chicago Quartermaster Purchasing Office late in 1948. With respect to the failure of The Herman Nelson Corporation to furnish a set of drawings to the Quartermaster Corps, it was indicated to the plaintiff’s president that the Quartermaster Corps needed to have a set of drawings of the portable gasoline tent heater in its files, and that, in connection with the next procurement of such a heater, the successful bidder would be required to furnish a set of drawings to the Quartermaster Corps prior to the completion of the contract.
5. The plaintiff was interested in the possibility of manufacturing portable gasoline tent heaters for the Army, and it undertook to investigate the feasibility of such a project.
6. Upon learning that two of the Herman Nelson heaters were located at the Chicago Quartermaster Purchasing Office, Alvin E. Vogt went to Chicago early in 1949 and inspected those heaters. One of the heaters was disassembled so that the various parts could be easily examined.
7. (a) Sometime in March or April of 1949, Alvin E. Vogt, accompanied by the plaintiff’s plant manager, visited the Jeffersonville Eesearch and Development Laboratories of the Quartermaster Corps. At that time, several Herman Nelson portable gasoline tent heaters, which had been modified in various ways as part of an experimental program •designed to improve the performance of this type of heater for Army use, were being tested. The plaintiff’s representatives were permitted to look at the modified heaters, and one •of them was turned over and the bottom cover was removed in order that the plaintiff’s representatives might make a better inspection of the heater’s interior construction. In addition, the plaintiff’s representatives were shown a Her*726man Nelson beater which had not been modified and which was then being operated to provide heated air for laundry equipment.
(b) During the course of the visit to the Jeffersonville Eesearch and Development Laboratories mentioned in paragraph (a) of this finding, the plaintiff’s representatives obtained a copy of War Department Technical Manual 10-1621, dated January 1944, which had been prepared by The Herman Nelson Corporation for use in maintaining and repairing the portable gasoline tent heaters manufactured by that company for the Army Air Forces. The manual contained photographs of a Herman Nelson heater and of all the parts included in the heater, maintenance and service instructions, and a parts list. The manual was not a procurement specification, and it had not been issued by the War Department for procurement purposes.
(c) The plaintiff’s representatives gained the impression, in talking with personnel of the Eesearch and Development Laboratories on the occasion of the visit referred to in this finding, that any future procurement of portable gasoline tent heaters by the Quartermaster Corps would involve the duplication of the Herman Nelson heater described in War Department Technical Manual 10-1621, and that a future contractor could obtain from the Jeffersonville Eesearch and Development Laboratories a sample heater to be copied in the manufacturing process.2
(d) The personnel of the Jeffersonville Eesearch and Development Laboratories was not authorized to speak for, or to act on behalf of, the Quartermaster Corps in connection with the making of contracts for the procurement of quartermaster items.
8. In examining the Herman Nelson heaters in Chicago and in Jeffersonville, as noted in findings 6 and 7, it was; observed by the plaintiff’s representatives (among other *727tilings) that the heaters were equipped with a Torrington 3-blade steel fan and with metal-rimmed steel wheels. Similarly, the copy of Technical Manual 10-1621 which the plaintiff’s representatives obtained from the Jefferson-ville Besearch and Development Laboratories showed the heater to be equipped with the same type of fan and wheels.

The Contract

9. (a) Under the date of May 18,1949, the Chicago Quartermaster Purchasing Office issued to a number of firms, including the plaintiff, Invitation for Bids No. QM-11-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 for (item No. 1) the procurement of 250 “heaters,. TENT, gasoline; in accordance with AAF Specification 40317-C, dated 6 November 1942, and Amendment 3, dated. 14 September 1944, with exceptions as set forth on Schedule ‘B,’ ” together with (item No. la) “Cost of bidder’s recommended first and second echelon tools and spare parts to accompany Heaters, Tent, Gasoline, in the form of a kit,” and (item No. lb) “Cost of bidder’s recommended 3rd to 5th echelon tools and parts for one year’s operation and maintenance.”
(b) Many deletions from, additions to, and changes in the provisions of AAF Specification No. 40317-C, as previously amended by Amendment No. 3, were provided for on Schedule “B” of the invitation for bids and on continuation sheets designated as Schedules “C”-“0”. AAF Specification No. 40317-C, as revised by the invitation for bids, was a performance type of specification. Basically, the specification called for a portable gasoline tent heater that would be capable of producing continuously not less than 250,000 B.T.U.’s per hour. It was not required that the heater conform to any particular design prescribed by the Quartermaster Corps.
(c) The invitation for bids stated (among other things) that the bids would be opened on June 6, 1949; that the notice of award would be issued at least 120 calendar days prior to the first delivery date; that deliveries were to be made at specified places in fixed monthly quotas during the period beginning November 1, 1949, and ending January 31, 1950; that liquidated damages for delay would be assessed at *728the rate of one-fifth of 1 percent of the price of each unit for each day’s delay after the scheduled delivery date; and that the Government reserved the right to increase the contract quantity at the time of the award of the contract by an amount not to exceed 25 percent.
(d) Schedule “B” of the invitation for bids contained the following provisions on the subject of drawings:
bid deawinos : — Bidders shall submit with bids a set of outlined drawings illustrating the heater bid upon, together with such published literature as may be available.
contract drawings : — The successful bidder shall furnish three (3) complete sets of reproducible manufacturing drawings and specifications for material and parts for approval prior to commencement of production.
(e) Paragraph E-13d of AAF Specification No. 40317-C, as revised by Schedule “H” of the invitation for bids, provided as follows:
The ignition system to the engine shall be provided exclusively by means of a magneto. Complete shielding against radio interference shall be provided.
If electric ignition is used on the burner unit such electric circuits shall be completely shielded against radio interference which might otherwise be objectionable.
(f) Paragraph F-3b of AAF Specification No. 40317-C, as added by Schedule “K” of the invitation for bids, provided as follows:
A mechanical endurance test shall be conducted on one representative unit selected by the inspector of procuring agency and shall consist of a “drop” test and a 1000 hour operational test.
In conducting the drop test, the fuel tank of the heater shall be filled not less than three-quarters full of Grade 80 tetraethyl leaded gasoline conforming to Specification AN-F-48a and Amendment #3. The unit shall then be placed on a substantial concrete floor. Under these conditions, with the wheels lowered into operating position, the wheel end of the heater shall be raised and dropped from a height of not less than ten inches. This shall be repeated not less than ten times. The heater wheels shall then be retracted and the heater handles raised to operating position. The handle end of the heater shall then be raised and dropped from a height of *729not less than ten times [sic], after which the unit shall show no visible loosening of, nor damage to, any of its components.
Thereafter, this same unit shall undergo a 1000 hour operational test using for fuel Grade 80 tetraethyl leaded gasoline conforming to Specification AN-F-48a, and Amendment #3. There shall be no failure of any part of the engine during the first 200 hours of continuous operational [sic] allowing only for normal shut-downs to replenish or change oil not oftener than once every 5 hours for a period not exceeding !4 hour. During the remaining 800 hours of operation the engine should receive the normal amount of servicing such as valve grinding and cleaning of engine head. There shall he no failure of the complete heater unit other than the engine during the first 1000 hours of operation.
(g) Paragraph F-3c of AAF Specification No. 40317-0, as added by Schedule “K” of the invitation for bids, provided as follows:
Gold tests. — One representative unit shall be exposed for a period of at least 12 hours to a temperature of minus 85° Fahrenheit. Under this condition, the unit shall be capable of being propelled on its wheels a distance of not less than ten feet and it shall show no visible deterioration of its rubber tires nor of any other-components. Also under this condition the heater shall, then be started and operated for a period of not less; than five minutes. The manufacturer’s detailed procedure for cold starting may be followed, and such procedure may include the preheating of the engine by lighting of the heater burner or alternately by mildly applying heat to the cylinder head, cylinder block, and exposed portion of the crank case.
(h) Paragraph G-5.3.4 of AAF Specification No. 40317-C, as added by Schedule “M” of the invitation for bids, pro-, vided as follows:
The inside and outside of all containers shall be cov-¡ ered with one cost [sic] 3 of lusterless olive-drab paint complying with Federal Specification TT-P-81.
(i) Paragraph H-4 of AAF Specification No. 40317-C, as added by Schedule “N” of the invitation for bids, provided as follows:
*730Waiver of test requirements. — Attention is invited to Paragraphs F-3b and F-3c, Mechanical Endurance Test, and Cold Tests, respectively. These requirements exist regardless of the number of units procured. The mechanical endurance test, and the cold tests shall not be required of a contractor who proposes to furnish a model accepted by the Procuring Agency on current or previous contracts as meeting the preferred requirements of this specification, or of those contractors who can establish to the satisfaction of the Purchasing and Contracting Officer that the unit they propose to furnish will meet the requirements of these tests.
10. (a) Under the date of June 4, 1949, the plaintiff submitted a bid hi response to the invitation for bids mentioned in finding 9. The plaintiff’s bid was prepared on the copy of the invitation which the plaintiff had received. In its bid, the plaintiff offered to furnish the heaters referred to in item No. 1 of the invitation at unit prices that ranged from $618.95 to $643, the variations being based on the different places specified for delivery; and the plaintiff offered to furnish the kits of first and second echelon tools and spare parts, referred to hi item No. la of the invitation, at a price of $44.66 per kit. One of the spare parts that the plaintiff proposed to furnish under item No. la was a Torrington 3-blade steel fan. With respect to item No. lb of the invitation, the plaintiff did not quote a price per kit on the third to fifth echelon tools and parts, but it did submit a list of spare parts with individual prices.
(b) In submitting its bid, the plaintiff typed the following statement on the bid form in connection with item No. 1 of the invitation, relating to the heaters:
Our bid is based on a duplication of the Herman Nelson Heater taken from the War Department Technical Manual 10-1621 dated Jan 1944 and from a Jeffersonville Depot sample heater.
(c) The plaintiff did not submit with its bid a “set of outlined drawings illustrating the heater bid upon,” as required by the invitation for bids (see finding 9(d)). It was the plaintiff’s belief that this requirement had been met, in effect, by the reference to Technical Manual 10-1621 in the plaintiff’s bid.
*73111. Before submitting the bid referred to in finding 10, the plaintiff reviewed the requirements of the invitation for bids with the Bank of Louisville, and obtained from that bank a tentative commitment for a $50,000 line of revolving credit, in return for the posting of collateral and the assignment of the proceeds of the contract, if the plaintiff were to be successful in obtaining the award.
12. The bids submitted in response to the invitation referred to in finding 9 (including the plaintiff’s bid mentioned in finding 10) were opened and reviewed at the Chicago Quartermaster Purchasing Office on June 6, 1949. The plaintiff’s bid was the lowest one submitted in response to the invitation. However, in view of the typed statement which the plaintiff had added in connection with item No. 1 (see finding 10(b)), the contracting officer was doubtful whether the plaintiff’s bid was responsive to the invitation. The contracting officer directed one of his subordinates at the Chicago Quartermaster Purchasing Office to call the plaintiff on the long-distance telephone and discuss this matter. The telephone call was received by the plaintiff’s president, who assured the representative of the contracting officer that it was the plaintiff’s intention, if it received the award, to furnish a heater that would fully meet all the requirements set out in the pertinent specification. The plaintiff’s president was requested to confirm this oral statement in writing. Thereupon, the following letter was written on behalf of the plaintiff to the Chicago Quartermaster Purchasing Office under the date of June 6, 1949:
In accordance with our telephone conversation of this afternoon regarding our bid under Serial No. QM-11-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 for heater, TENT, gasoliNe, we are pleased to confirm that said bid is in accordance with Government Specifications in all respects.
Furthermore, the spare parts will conform to the existing break downs of manufactured and purchased parts and will therefore be interchangeable with the existing Herman Nelson heaters.
13. (a) On or about June 10, 1949, the Chicago Quartermaster Purchasing Office conducted a pre-award survey, which included a visit by a Government inspector to the plaintiff’s plant. The pre-award survey report indicated *732that the plaintiff had adequate facilities and capacity to perform the proposed contract, and recommended that the contract be awarded to the plaintiff.
(b)On June 17, 1949, the director of procurement at the Chicago Quartermaster Purchasing Office visited the plaintiff’s plant and inspected its facilities. The director of procurement, accompanied by the plaintiff’s president, then visited the Bank of Louisville and verified the fact that the plaintiff had a tentative commitment from the bank for a $50,000 loan to perform the contract, if the plaintiff received the award.
14. (a) In a letter dated June 24, 1949, the contracting officer notified the plaintiff that its bid had been accepted and that contract No. W 11-183-qm-8180 had been awarded to the plaintiff. In making the award, the Government exercised its option to increase by 25 percent the quantities specified in the invitation for bids, so that the award covered 312 heaters and 312 kits of first and second echelon tools and spare parts. This increase in quantity also resulted in an adjustment of the time for final completion of the contract from January 31 to March 31, 1950.
(b) The formal contract was dated June 24,1949, and was numbered W 11-183-qm-8180. It was transmitted on July 13, 1949, by the Chicago Quartermaster Purchasing Office to the plaintiff for signature, and was received by the plaintiff on July 15, 1949. The contract was signed by the plaintiff on July 19, 1949.
(c) Item No. 1 of contract W 11-183-qm-8180 (which will usually be referred to hereafter in the findings as “the contract”) covered the furnishing of 312 “heaters, TENT, gasoLiNE; in accordance with AAF Specification 40317-C, dated 6 November 1942, and Amendment 3, dated 14 September 1944, with exceptions as set forth herein.” The exceptions specified in the contract consisted of the same deletions from, additions to, and changes in AAF Specification No. 40317-C, as previously amended by Amendment No. 3, that are referred to in finding 9.
(d) Item No. la of the contract covered the furnishing of 312 kits of first and second echelon tools and spare parts. One kit was to accompany each heater produced under item No. 1.
*733(e) Article 11 of the contract, dealing with the subject of disputes, provided in part as follows:
Except as otherwise specifically provided in this contract, all disputes covering questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of the Army, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. * * * The Contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. * * * Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract. * * *
(f) The plaintiff’s bid and its letter dated June 6, 1949 (see finding 12) were incorporated in and made part of the contract by reference.

Sample Heater

15. (a) Shortly after the plaintiff received the notice of award mentioned in finding 14, an inquiry was made of the Jeffersonville Research and Development Laboratories over the telephone as to whether a representative of the plaintiff might call at that installation and obtain a sample Herman Nelson heater to be copied in the performance of the contract. The plaintiff was informed by personnel of the Quartermaster Corps at Jeffersonville that as a contract matter was involved, it would be necessary for the plaintiff to get in touch with the Chicago Quartermaster Purchasing Office.
(b) On June 27, 1949, the plaintiff wrote the following letter to the Chicago Quartermaster Purchasing Office:
We have begun tooling up for the above referenced contract and find that it is imperative for us to have a sample of the Heater, Tent, Gasoline in our plant.
We are advised that there is such a sample available at the Jeffersonville Quartermaster Depot which can be released upon authorization from you.
As soon as we receive your authorization we will have our truck pick this sample up.
Your prompt cooperation will be greatly appreciated.
*734(c) As the plaintiff had not, as of July 8, 1949, received a response to the letter mentioned in paragraph (b) of this finding, the plaintiff’s president went to Chicago on July 8 and conferred with the contracting officer and other personnel of the Chicago Quartermaster Purchasing Office concerning the plaintiff’s desire for a sample heater. The contracting officer initially took the position that since the invitation for bids and the contract did not impose any requirement that a Herman Nelson heater be duplicated, there was no need for the Quartermaster Corps to make any arrangement with respect to the furnishing of a sample Herman Nelson heater to the plaintiff. However, after discussing the matter with the plaintiff’s president, the contracting officer said that it would be satisfactory with the Government for the plaintiff to duplicate a Herman Nelson heater, so long as the end product complied in all respects with the requirements of AAF Specification No. 40317-C, as revised by the invitation for bids and the contract. Consequently, the Chicago Quartermaster Purchasing Office arranged for one of the latest Herman Nelson heaters to be shipped on July 8, 1949, from the Columbus, Ohio, Quartermaster Depot to the Jeffersonville Quartermaster Depot for delivery to the plaintiff. The plaintiff obtained the sample Herman Nelson heater from the Jeffersonville Depot on July 13,1949.
16. On July 13, 1949, the plaintiff wrote a letter to the Chicago Quartermaster Purchasing Office, stating in part as follows:
Since we could not * * * proceed until this sample was actually received by us today, we respectfully request an extension of time of deliveries corresponding to the interim between 24 June 1949 and today, 13 July 1949.
17. The contracting officer replied on July 18, 1949, to the letter mentioned in finding 16. The contracting officer stated in part as follows:
You are advised that delivery extension cannot be granted as the sample involved is not a part of the contract requirements and has merely been furnished you as a service. As previously advised, the sample has no bearing on the item to be manufactured under the contract as the item is to be produced strictly in accordance *735with the specification requirements without reference to any sample. Your delay in starting shop drawings is not the responsibility of this office and consequently your request for extension cannot be granted.
18. When the sample Herman Nelson heater which the Quartermaster Corps furnished to the plaintiff on July 13, 1949, was examined in the plaintiff’s plant, it was found to be different in the following important respects from the Herman Nelson heaters which the plaintiff’s representatives had examined in Chicago during the early part of 1949 (see findings 6) and in Jeffersonville during March or April of 1949 (see finding 7), and from the Herman Nelson heater depicted in Technical Manual 10-1621:
(a) The sample heater was equipped with a 4-blade aluminum fan, instead of the 3-blade Torrington steel fan which the plaintiff’s representatives had observed on the other Herman Nelson heaters and which was depicted in Technical Manual 10-1621. The blades of the two types of fans were shaped differently; and the hub for the aluminum fan was about 3 inches longer than the hub for the Torring-ton fan.
(b) The wheels on the sample Herman Nelson heater were equipped with ball bearings and with semi-pneumatic rubber tires, whereas the Herman Nelson heaters which the plaintiff’s representatives had previously examined and the Herman Nelson heater depicted in Technical Manual 10-1621 were equipped with steel wheels that had metal treads and no ball bearings.
19. Shortly after the receipt of the sample Herman Nelson heater by the plaintiff, Alvin R. Vogt got in touch with an official of tlie Research and Development Laboratories at Jeffersonville and brought up the matter of the discrepancies between the sample heater and the Herman Nelson heaters which the plaintiff’s representatives had previously seen at Jeffersonville (see finding 7). The official of the Research and Development Laboratories suggested to Mr. Vogt that he get in touch with the contracting officer in Chicago and report these discrepancies. Accordingly, Alvin R. Vogt went to Chicago on August 12, 1949, and, in the absence of the contracting officer, discussed this matter with another official of the Chicago Quartermaster Purchasing Office. *736During the course of the discussion, it was agreed between Mr. Vogt and the representative of the Quartermaster Corps that the plaintiff, in manufacturing heaters under the contract, would duplicate the Herman Nelson heater that had been furnished to the plaintiff by the Quartermaster Corps on July 13,1949.
20. (a) Following the conference on August 12,1949 (see finding 19), the plaintiff on August 18, 1949, wrote a letter to the Chicago Quartermaster Purchasing Office. In this letter, the plaintiff expressed the understanding that the heaters to be furnished under the contract were to be copies of the sample heater which the plaintiff had received on July 13, 1949.
(b) In the letter mentioned in paragraph (a) of this finding, the plaintiff requested a reconsideration of its request dated July 13, 1949, for an extension of time, “in view of subsequent developments.”
21. By means of a change order which the contracting officer issued on September 12,1949, and which was denominated modification “A,” (the contract was amended by the inclusion of the following provision:
The supplies to be furnished under said contract shall be manufactured in strict accordance with specification requirements and exceptions called for therein, and
Sample Heater, Tent, Gasoline, made available to the contractor at Jeffersonville Quartermaster Depot, Jeffersonville, Indiana.
22. It was indicated in a letter dated September 12,1949, from the contracting officer to the plaintiff that further consideration would be given to the plaintiff’s request for an extension of time because of the delay in receiving a sample Herman Nelson heater from the Quartermaster Corps.
23. A letter dated September 30, 1949, from the contracting officer to the plaintiff indicated that the former had recommended the granting of an appropriate extension of time and that the matter was then receiving consideration in the Legal Branch of the Chicago Quartermaster Purchasing Office.
24. An 18-day extension of time because of the delay by the Quartermaster Corps in furnishing a sample Herman *737Nelson heater was granted to the plaintiff by the contracting officer in a determination dated October 19, 1949. This determination was denominated modification “B” of the contract. It was accepted by the plaintiff on October 28, 1949.
25. In a letter dated December 9, 1949, to the Chicago Quartermaster Purchasing Office, the plaintiff stated in part .as follows:
Until September 19, 1949 when we received proposed Modification “A” stipulating that the supplies furnished under the referenced contract were to conform to the sample heater received from the Jeffersonville Quartermaster Depot, we had no real positive agreed basis on which to proceed with assurance in the preparation of drawings and the other requirements. Thus we were delayed form [sic] June 24, 1949 until September 19, 1949, or a total of 87 days. Modification “B” provides for the deduction of 18 days from this total, leaving a net delay period of 69 days.
Therefore we herewith request immediate interim extension of delivery schedule of 69 days additional to the 18 days granted in Modification “B”.

Contract Drawings

26. With respect to the provision of the contract dealing with the subject of contract drawings (see finding 9(d)),4 the contracting officer on August 5,1949, wrote the following letter to the plaintiff:
It is requested that the three (3) complete sets of reproducible manufacturing drawings and specifications for material, and parts to be furnished for approval prior to commencement of production on Contract No. W11-183-qm-8180 * * *, when available, be directed to this office.
27. The plaintiff had been under the impression that any contract drawings that might be required by the Quartermaster Corps could be submitted at any time prior to the completion of the contract (see finding 4),5 and the plaintiff believed that its production under the contract would be *738greatly interfered with if it were required to furnish a complete set of drawings prior to the commencement of production.
28. After receiving the letter of August 5, 1949, from the contracting officer (see finding 26), the plaintiff got in touch with personnel of the Research and Development Laboratories at Jeffersonville and discussed the possibility of an arrangement whereby the drawings could be submitted piecemeal, as the plaintiff made ready to produce or procure the various components of the heater, in lieu of submitting three complete sets of drawings prior to the commencement of production. The plaintiff’s suggestion was referred by the Jeffersonville personnel to the Chicago Quartermaster Purchasing Office for consideration.
29. In a letter dated August 8,1949, from the contracting officer to the plaintiff, it was stated in part as follows:
This office has been informed that discussion has been held between your company and the Research and Development Laboratories at the Jeffersonville Quartermaster Depot concerning the advantages to be obtained in submission and approval of drawings under the above contract on a partial basis rather than at the time of availability of complete drawings and specifications.
This office will have no objection to processing drawings from time to time in an effort to expedite the handling of this contract. However, it is requested that such drawings be submitted on a sub-assembly basis and not on individual components thereof.
30. The plaintiff on August 8, 1949, replied as follows to the letter mentioned in finding 26:
Regarding your letter of 5 August 1949 there is no mention of our furnishing drawings and specifications in the special contract conditions in the Schedule of Supplies of above referenced contract.
However should you require same we feel that it would be to the best interest of all concerned, for us to send them to you just prior to the completion of the contract. At such a time really accurate reproductions could be obtained without delaying our production.
31. The contracting officer’s reply to the letter set out in finding 30 was dated August 9, 1949, and stated in part as follows:
*739In clarification of this particular and confirming telephone conversation 8 August 1949 between your Mr. A. E. Vogt and Mr. C. C. Field of this office, the contract provides that three complete sets of reproduceable [sic] manufacturing drawings and specifications for material and parts to be submitted to this office for approval prior to commencement of production. This provision appears in your bid on which the contract is based. If you will refer to Page 2 of the contract under Article I, you will find that it is agreed that the commodity will be furnished as specified in the schedule of supplies and subject to all of the terms and conditions thereinafter set forth, including your Bid No. 3 submitted under Invitation No. Wll-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 which is specifically referenced.
32. In accordance with the understanding that had been reached relative to the submission of drawings on a sub-assembly basis, the plaintiff mailed the first group of drawings to the Chicago Quartermaster Purchasing Office on August 15,1949. These drawings covered the combustion chamber subassembly. On the same day, the plaintiff wrote a letter to the Chicago Quartermaster Purchasing Office stating in part as follows:
We must call your attention to the fact that our production schedule has been greatly retarded by our submitting these pre-production drawings and we will have to request an extension of the delivery schedule to compensate for the time lost in your securing approval of our drawings.
Our factory schedule was set for the fabrication of the parts immediately upon completion of shop drawings and therefore the shop will now have lots of idle production time pending the return of these drawings to us. Furthermore with this interruption of production our costs will be greatly increased.
33. The contracting officer’s reply to the plaintiff’s letter of August 15, 1949 (see finding 32) was dated August 17, 1949, and stated in part as follows:
* * * As you have not made formal application for an extension no decision can be rendered. Provided you make formal application for an extension of time on this basis, the Contracting Officer would give consideration to the following facts.
*740The drawings now being furnished are a requirement in the invitation for bids to which you took no exception when submitting your proposal. Therefore, the time element for preparation may not be considered as extraneous to performance of the contract. Similarly, the requirement for approval of drawings prior to commencement of production cannot be charged with retarding fabrication, having been accepted as a condition of your ability to meet the delivery requirements.
34. In confirmation of a telephone conversation between Alvin It. Vogt and personnel of the Chicago Quartermaster Purchasing Office, the contracting officer on August 31,1949, wrote a letter to the plaintiff stating that contract drawings to be submitted for approval prior to production under the contract “will be acceptable in blueprint form, thus permitting reflection of any changes in the three final sets of Van Dykes to be furnished at completion of contract.”
35. The group of drawings relating to the combustion chamber subassembly, which the plaintiff submitted on August 15, 1949, were returned to the plaintiff, approved, on September 26, 1949.
36. A group of drawings relating to the cabinet and fuel tank subassemblies was submitted by the plaintiff on September 17, 1949. These drawings were returned to the plaintiff, approved, on January 3, 1950.
37. A drawing relating to instruction plates was submitted by the plaintiff on October 5, 1949. This drawing was returned to the plaintiff, approved, on December 21, 1949.
38. A drawing relating to the blower fan housing assembly was submitted by the plaintiff on October 5, 1949. This drawing was returned to the plaintiff for supplemental data on October 21, 1949.
39. A drawing relating to the burner air chamber assembly was submitted by the plaintiff on October 5, 1949. This drawing was returned to the plaintiff for supplemental data on October 21, 1949. It was resubmitted by the plaintiff on November 4, 1949, and was returned to the plaintiff, approved, on January 3, 1950.
40. A group of drawings relating to various other components was submitted by the plaintiff on November 4,1949. These drawings were returned to the plaintiff, approved, on January 3, 1950.
*74141. A drawing relating to the cleanout coyer gasket was. submitted by the plaintiff on December 14, 1949. This drawing was returned to the plaintiff, approved, on December 29, 1949.
42. A drawing relating to the fan adapter was submitted by the plaintiff on December 27, 1949. It was returned to. the plaintiff, approved, on January 19, 1950.
43. A conference was held in Chicago on January 4, 1950, between representatives of the plaintiff and personnel of the Chicago Quartermaster Purchasing Office, including the contracting officer. The purpose of the conference was to-discuss problems that had arisen in connection with the contract. One of the problems discussed was the submission of contract drawings for approval. It was contended on behalf of the plaintiff that the Government’s purpose in obtaining the drawings of the portable gasoline tent heater would be served by the submission of the remainder of the drawings at any time prior to the completion of the contract. As a result of the discussion, it was agreed by the contracting officer that the plaintiff would not be required to-submit further drawings on a subassembly basis as work under the contract progressed, but that the plaintiff might submit the remainder of the drawings at its convenience, so long as they were furnished prior to the date of the final payment under the contract.

Fan

44.As indicated in finding 18(a), the sample Herman Nelson heater which the plaintiff received from the Quartermaster Corps on July 13, 1949, was equipped with a 4-blade aluminum fan instead of the 3-blade Torrington steel fan which the plaintiff’s representatives had observed on the Herman Nelson heaters in Chicago during the early part of 1949 and in Jeffersonville during March or April of 1949, and which was depicted in Technical Manual 10-1621. Moreover, in item No. la of the contract, relative to the furnishing of kits of tools and spare parts to accompany the heaters, the plaintiff’s offer, which had been accepted by the Quartermaster Corps, was to furnish (among other things) a Tor-rington fan as a spare part in each kit. The blades of the *742two types of fans were shaped differently; and the hub that had been provided on the sample Herman Nelson heater for the aluminum fan was about 3 inches longer than the hub that had been provided for the Torrington fan on the Herman Nelson heaters previously examined by the plaintiff’s representatives. The plaintiff had expected to duplicate the Torrington steel fan in its sheet metal division, but it was not feasible for the plaintiff to duplicate the aluminum fan that was on the sample heater. Moreover, the fan on the sample heater had the word “Patented” stamped on it. The Torrington fan could not be used with the long fan-hub on the sample heater.
45. After it was agreed on August 12, 1949 (see finding 19) that the plaintiff, in performing the contract, would ■duplicate the sample Herman Nelson heater which had been furnished to the plaintiff by the Quartermaster Corps on July 13, 1949, the plaintiff undertook to locate a source of supply for the patented aluminum fan. Having learned that the patent on the aluminum fan was held by The Herman Nelson Corporation, the plaintiff in a letter dated August 13, 1949, requested The Herman Nelson Corporation to quote a price on 624 Herman Nelson fans (for the heaters and the spare parts kits). The Herman Nelson Corporation replied on August 17, 1949, and said that the fan was not available for sale “except with other components.”
46. Thereafter, the plaintiff removed the Herman Nelson fan from the sample heater and sent the fan to the Torring-ton Manufacturing Company, with an inquiry as to whether that company could duplicate the fan for the plaintiff. A negative reply was received from the Torrington Manufacturing Company.
47. In a letter dated September 16, 1949, to the Chicago Quartermaster Purchasing Office, the plaintiff called attention to the fact that the sample heater was equipped with a Herman Nelson fan, whereas the portion of the contract relating to the furnishing of kits of tools and spare parts to accompany the heaters provided for the furnishing of a Tor-rington fan as a spare part in each kit. This letter then stated:
Since the two fans are not interchangeable we must have a clarification as to which fan you will want and *743whether you will want the spare fan to be the same as the one furnished with the complete Heaters.
48. In a letter dated October 4, 1949, the plaintiff requested The Herman Nelson Corporation to reconsider its refusal to sell Herman Nelson fans to the plaintiff. The Herman Nelson Corporation replied on October 13, 1949, and again declined to sell the fans to the plaintiff.
49. During the course of a conference with the contracting officer in Chicago on November 4, 1949, Alvin R. Vogt disclosed the difficulty that the plaintiff had encountered in attempting to procure the Herman Nelson fan.
50. The plaintiff on December 14, 1949, proposed to the Chicago Quartermaster Purchasing Office that the Torring-ton fan, with an adapter to fit it onto the long fan-hub provided for in the sample Herman Nelson heater, be used on the heaters manufactured under the contract, in lieu of the Herman Nelson fan with which the sample heater was equipped.
51. In response to an inquiry from the contracting officer as to whether the substitution of the Torrington fan for the Herman Nelson fan would involve an increase in the cost of the heater, the plaintiff stated in a letter dated December 27, 1949, that the substitution of the Torrington fan would not involve any additional charge except for the adapter, and that the cost of the adapter would be $1.45 per unit, or a total of $452.40 for the 312 units.
52. At the conference in Chicago on January 4, 1950 (see finding 43), the contracting officer agreed that the Tor-rington fan, with adapter, could be used on the heaters manufactured under the contract, instead of the Herman Nelson fan with which the sample heater was equipped. Personnel of the Quartermaster Corps suggested that the fan adapter, as proposed by the plaintiff, should be revised in certain minor respects, and the plaintiff acquiesced. It was agreed that the extra charge for the fan adapter, as thus modified, would be $1.60 per unit. An arrangement was made whereby the plaintiff would prepare and submit to the Research and Development Laboratories at Jefferson-ville drawings of the fan adapter that was to be used in connection with the Torrington fan.
*74453. Following tlie conference on January 4, 1950, the plaintiff prepared and then submitted to the Eesearch and Development Laboratories at Jeffersonville on January 9, 1950, drawings of the fan adapter that was to be used in connection with the Torrington fan. These drawings were returned to the plaintiff by the contracting officer, approved subject to certain changes, on January 18, 1950. Devised drawings, which incorporated the changes, were prepared by the plaintiff and submitted to the contracting officer. These revised drawings were approved by the contracting officer on February 8, 1950.6

Wheels

54. The wheels on the sample Herman Nelson heater which the plaintiff received from the Quartermaster Corps on July 18, 1949, were equipped with ball bearings and with semi-pneumatic rubber tires. The Herman Nelson heaters which the plaintiff’s representatives had previously examined in Chicago during the early part of 1949 and in Jeffersonville during March or April of 1949 had been equipped, and the Herman Nelson heater depicted in Technical Manual 10-1621 was shown to be equipped, with steel wheels that had metal treads and no ball bearings. The plaintiff had the necessary facilities in its plant to duplicate the steel wheels with metal treads, but it was not feasible for the plaintiff to make rubber-tired wheels with ball bearings.
55. After it was agreed at the conference on August 12, 1949 (see finding 19) that the plaintiff would duplicate the sample Herman Nelson heater, the plaintiff endeavored to find a source of supply for wheels of the type on the sample heater. This effort was unsuccessful. However, the plaintiff in December 1949 did locate a source of supply for a wheel that was similar to the one on the sample heater, except that the former had a wider hub than the latter.
*74556. On December 14, 1949, the plaintiff proposed to the contracting officer that the wheel with the wider hub, mentioned in finding 55, be used on the heaters to be manufactured under the contract, in lieu of the wheel with which the sample heater was equipped.
57. In response to an inquiry from the contracting officer as to whether the wheel substitution proposed by the plaintiff would increase the cost of the heater, the plaintiff in a letter dated December 27,1949, stated that no change in the contract price would be involved in connection with the wheel item.
58. At the conference that was held in Chicago on January 4, 1950 (see finding 43), the plaintiff was informed by the contracting officer that its proposal regarding the wheel substitution was approved.

Mechanical Endurance and Odld Tests

59. In connection with the contract requirements regarding mechanical endurance and cold tests (see finding 9(f), (g) ,(i)), the plaintiff wrote the following letter to the Chicago Quartermaster Purchasing Office on October 24,1949:
Since it is the intent of the above referenced contract to assure delivery of units duplicating the sample submitted we request a waiver of all unnecessary tests requirements, especially the Mechanical Endurance Test paragraph F-3b and Cold Test paragraph F-3c.
We are filing for this waiver at the present time so that the action will be completed by the time required.
60. The matter of the mechanical endurance and cold tests was discussed by Alvin N. Vogt with the contracting officer at a conference that was held in Chicago on November 4, 1949. Mr. Vogt stated to the contracting officer that the plaintiff was entitled to have the tests waived, but had not received a waiver.
61. The plaintiff was informed by means of a communication dated December 5, 1949, from the contracting officer that the plaintiff’s letter of October 24, 1949, had been forwarded to the Office of the Quartermaster General for decision. The contracting officer then stated:
* * * This office has been advised that authority to-waive test requirements under the contract for Heater, *746Tent, Gasoline, is not granted. However, you are advised that upon completion of the operating tests on finished units consideration will be given to the waiver of the one thousand hour test at that time.
62. A letter dated December 13, 1949, from the plaintiff to the Chicago Quartermaster Purchasing Office stated in part as follows:
We refer you specifically to paragraph H-4 of referenced contract containing the following:
“The mechanical endurance test, and the cold tests shall not be required of contractor who proposes to furnish a model accepted by the Procuring Agency on current or previous contracts as meeting the preferred requirements of this specification.”
Our original bid specified we would furnish you heaters that were a “duplication of the Herman Nelson Heater taken from the War Department Technical Manual 10-1621 dated Jan 1944 and from a Jefferson-ville Depot sample heater.”
It goes without saying that the sample you furnished us had been “accepted by the Procuring Agency on current or previous contracts as meeting the preferred requirements of this specification.” Since ours is therefore covered by the referenced paragraph, we must insist on a favorable reconsideration of our request of October 24, 1949, waiving said tests.
63. At the conference that was held in Chicago on January 4, 1950 (see finding 43), the plaintiff’s representatives requested that the matter of the mechanical endurance and cold tests be discussed along with other problems, but the conference was adjourned at the end of the day without that particular matter having been taken up by the conferees.
64. In a letter dated January 5, 1950, the contracting officer informed the plaintiff (among other things) that a modification of the contract, embodying the changes that had been agreed upon at the conference of January 4,1950, would be forwarded to the plaintiff for approval and execution “within the next few days.”
65. A letter dated January 10, 1950, from the plaintiff to the Chicago Quartermaster Purchasing Office stated in part as follows:
In view of your letter of 5 December 1949 refusing to *747waive the mechanical endurance tests paragraph F-3b and cold test paragraph F-3c, it is essential that these waivers be incorporated in the modification proposed in yours of 5 January 1950. Our letter to you dated December 13th, 1949 cited some of our reasons why same do not apply to us. Certainly these could not be covered in the maximum of two weeks inspection period calculated in arriving at the April 30, 1950 delivery date and we certainly are unwilling to ship any units not fully accepted prior to shipment.
66. A proposed modification of the contract, designated as modification “C,” was issued by the contracting officer on January 19, 1950. It covered proposed changes in the contract that had been agreed upon at the conference of January 4, 1950, with respect to a substantial number of matters, but it did not contain any reference to a waiver of the mechanical endurance and cold tests.
67. After the plaintiff received the proposed modification “C” and noticed that it did not provide for a waiver of the mechanical endurance and cold tests, a representative of the plaintiff on January 23, 1950, called the Chicago Quartermaster Purchasing Office on the long-distance telephone with the intention of talking to the contracting officer about this matter. On learning that the contracting officer was absent due to illness, the plaintiff’s representative talked with the chief of the Legal Branch of that office. The latter stated that the Chicago Quartermaster Purchasing Office was awaiting an authorization from the Office of the Quarermaster General to waive the mechanical endurance and cold tests.
68. In a letter dated January 27, 1950, to the Chicago Quartermaster Purchasing Office, the plaintiff complained about the failure of modification “C” to provide for a waiver of the mechanical endurance and cold tests. The plaintiff went on to say in the letter that if such tests were to be required, the plaintiff would be entitled to an extension of time and to an increase in the contract price.
69. In a letter dated February 21,1950, from the plaintiff to the Chicago Quartermaster Purchasing Office, the plaintiff again complained of the delay on the part of the Quartermaster Corps in acting on the plaintiff’s request for a. waiver of the mechanical endurance and cold tests. This, letter stated in part as follows:
*748In phone conservation of last Friday you promised us a decision yesterday stating that you in turn had just concluded a phone conversation with Washington and had been promised a definite answer in. writing by yesterday and would immediately communicate same to us. Now in phone conversation just concluded you state you still have nothing final for us.
We are being tremendously penalized both in added costs of production and probable time of completion by your failure to give us clarification for which of course we shall have to be appropriately reimbursed. Even after a decision is received, production flow, acceptance and shipment will be further delayed pending revised inspection requirements and securing approval of our functional test methods which must be drawn up by QM Inspection Service as a directive to the resident inspector here.
70. The plaintiff was informed on March 2, 1950, by means of a telephone call and a confirming telegram from :the Chicago Quartermaster Purchasing Office that the mechanical endurance and cold tests would not be required. This waiver was later provided for formally in the final version of modification “C” of the contract, which was issued ;by the contracting officer on April 21 and accepted by the plaintiff on April 25, 1950.
71. The plaintiff’s operations were delayed and its costs were increased by reason of the Government’s failure to ;act with reasonable promptness on the plaintiff’s request for -a waiver of the mechanical endurance and cold tests.

Stellite Valve

72. The Herman Nelson heaters which representatives of 'the plaintiff examined in Chicago during the early part of 1949 and in Jeffersonville during March or April of 1949 were equipped, and the Herman Nelson heater depicted in Technical Manual 10-1621 was shown to be equipped, with a Briggs & Stratton engine that had a standard exhaust value. The plaintiff, in submitting its bid, intended to equip the heaters manufactured under the contract with Briggs & •Stratton engines, if it received the award; and the plaintiff ■offered to provide a standard exhaust valve as a spare part in the kit of tools and spare parts to accompany each heater. Accordingly, the plaintiff, after receiving the award, got in *749touch, with the Briggs & Stratton Corporation and asked fora quotation on Briggs & Stratton engines to be used in the-heaters under item No. 1 of the contract, and for a quotation on standard exhaust valves to be included in the kits of tools- and spare parts under item No. la of the contract. The-Briggs & Stratton Corporation informed the plaintiff that the engines which it had furnished to The Herman Nelson-Corporation for use in connection with the more recent production of portable gasoline tent heaters were not equipped' with standard exhaust valves but with exhaust valves made of Stellite, an extra-hard, heat-resistant metal.
73. The availability of the superior Stellite exhaust valve-was called to the attention of the contracting officer by the-plaintiff’s president at a conference in Chicago on July 8,. 1949. The plaintiff’s president was informed that the matter would be investigated further by the Quartermaster Corps.
74. On July 11, 1949, the plaintiff received a telephone-call from the Chicago Quartermaster Purchasing Office. The latter requested a quotation on the price differential between the Stellite exhaust valve and the standard exhaust valve for the spare parts kits.
75. On July 11, 1949, after the telephone conversation referred to in finding 74, a letter was written on behalf of" the plaintiff to the contracting officer, stating in part as-follows:
Under item la Kit consisting of First and Second Echelon spare parts, item 25th listed as part number-23663 is specified as 1 exhaust valve price $1.50. This-item is a standard exhaust valve and we now understand that you desire part number 26515 which is a Stellite-exhaust valve. The price of this part number 26515-is $7.20 each instead of the $1.50 price for the part number 23663.
76. (a) A letter dated July 12, 1949, from the Briggs <§r: Stratton Corporation to the plaintiff stated as follows:
We herewith confirm our statement to you regarding-exhaust valves for the 312 gasoline engines for the government tent heaters.
Part No. 23663, as originally quoted you, is the-standard construction exhaust valve for these engines-
*750Part No. 26515 is the same exhaust valve, except made of Stellite.
Our current catalog price of part No. 2366B is $1.50 each, and of part No. 26515 is $7.20 each.
(b) The letter quoted in paragraph (a) of this finding was forwarded by the plaintiff to the contracting officer on July 14, 1949.
77. As indicated in previous findings, the plaintiff received a sample Herman Nelson heater from the Quartermaster Corps on July 13, 1949; and it was agreed at a conference in Chicago on August 12, 1949, that the plaintiff, in furnishing heaters under item No. 1 of the contract, would duplicate this sample heater. The sample Herman Nelson heater was equipped with a Briggs & Stratton engine that had a Stellite exhaust valve.
78. The question whether the exhaust valves for inclusion in the kits of tools and spare parts under item No. 1a of the contract were to be Stellite exhaust valves or standard exhaust valves was discussed at the conference in Chicago on August 12, 1949. The plaintiff was informed that the matter would be taken under advisement by the Quartermaster Corps.
79. A letter dated August 23, 1949, from the contracting officer to the plaintiff stated in part as follows:
It has been determined that an adequate supply of exhaust valves is on hand in army storage, and it is, therefore, proposed that the item of one each exhaust valve, part number 23663, be deleted from the list of items to be furnished as a Kit.
Information is desired as to whether or not it is agreeable to your company that such deletion be made by modifying the contract with a proper adjustment in cost of contract and without cost to the Government.
'80. A letter dated September 13, 1949, from the plaintiff ito the Chicago Quartermaster Purchasing Office stated in jpart as follows:
The engines which we intend furnishing for subject contract are of the following specifications which we have taken from the sample sent us for reproduction. Briggs and Stratton Model “N” Type 306317 * * * with * * * stellite exhaust valve * * *.
*75181. On. September 16, 1949, the plaintiff wrote another .’letter to the contracting officer, stating in part as follows:
We can arrange to delete the exhaust valve part number 23663, from the spare part kit.
However, in the modification of the contract price a proper adjustment must include the additional cost of the Stellite Valve for the engine (i.e. $7.20 less $1.50) or $5.70 and the $1.50 credit for the deleted valve which makes u total increase in the contract price of $4.20 per unit.
82. The following letter was written by the contracting •officer to the plaintiff under the date of September 28,1949:
Reference is made to letter this office dated 23 August and to several subsequent verbal conversations relative to the proposed deletion of exhaust valve, part number 23663, from the list of items to be furnished as a kit accompanying Heaters, Tent, Gasoline, on Contract W-ll-183-qm-8180, Order No. 7594-GS-49.
Is it now possible to indicate your decision on deletion to permit The Quartermaster General being informed as to the action taken,
'83. The plaintiff replied as follows on September 29,1949, 'to the letter mentioned in finding 82:
Replying to your letter of 28 September 1949 please refer to our letter of 16 September 1949.
We are enclosing a copy of this letter.
84. The matter of the exhaust valve was discussed by Alvin R. Vogt with the contracting officer at a conference in «Chicago on November 4, 1949. The contracting officer reiterated the position that he had taken in his letter of August 23, 1949 (see finding 79). He stated that the Quartermaster Corps had on hand numerous Stellite exhaust waives that would fit the heater engines, and that, as a saving to the Government, the Quartermaster Corps was prepared to furnish these Stellite exhaust valves for the spare parts kits and to delete the requirement under item No. la for the plaintiff to furnish standard exhaust valves as spare parts.
85. A letter dated December 27, 1949, from the plaintiff •to the Chicago Quartermaster Purchasing Office stated in part as follows:
*752On this same subject of contract modifications we feel obliged to remind you that we have not yet received contract modification for $4.20 per imit or a total of' $1310.40 for the 312 units for the additional cost of the stellite exhaust valves for the engines. This was established in our letter to you of September 16, 1949 in answer to yours of 23 August 1949 and again in ours of September 29, 1949 replying to yours of 28 September 1949.
86. At the conference in Chicago on January 4, 1950 (see-finding 43), it was agreed that the requirement under item No. la of the contract for the furnishing by the plaintiff of standard exhaust valves in the spare parts kits would be-deleted, and that the Quartermaster Corps would provide 312 Stellite exhaust valves to the plaintiff for inclusion in the spare parts kits.
87. In a letter dated January 5,1950, from the contracting officer to the plaintiff, relative to a number of agreements-that had been reached at the conference on January 4,1950,. it was stated in part as follows:
* * * As to a few matters, such as the problem relating to the furnishing of stellite valves for the replacement parts kit, further advice from the Office of The Quartermaster General as to its desires will be necessary. It is the desire of this office to obtain decisions as to these-matters immediately so that the modification can cover the same. In any event, these matters relate to details-as to which a general understanding was arrived at.
88. A letter dated January 10,1950, from the plaintiff to the Chicago Quartermaster Purchasing Office stated in part as follows:
As we told you our bid shows an honest mistake regarding the stellite valves against which there was no warning in the specifications. Briggs & Stratton Corp. confirmed in their letter to us of July 12th, 1949 which we sent you that they had quoted us Part No. 23663, the standard construction exhaust valve, which we in turn specified in our bid quotation. Certainly we would not furnish anything different in the original engines than in the spare parts; and we applied for an extra cost in our letter of July 11, 1949.
In your letter of 23 August 1949 you proposed eliminating the spare parts exhaust valves so we wrote you September 16, 1949 that we would do so if reimbursed *753for the 312 included in the engines. We would extend this even further, in the interest of immediate action, agreeing now to pack without extra cost 312 Stellite Valves furnished by you in the spare parts kit upon your agreement to reimburse us per our proposal of September 16, 1949.
89. A telephone call was made by the Chicago Quartermaster Purchasing Office to the plaintiff on January 13,1950. The plaintiff was informed that the Office of the Quartermaster General had approved the plan whereby the Quartermaster Corps would provide Stellite exhaust valves for inclusion by the plaintiff in the kits of spare parts, and the plaintiff would be entitled to collect a service charge of 75 cents per unit in connection with the handling of the spare exhaust valves. On the same day, the plaintiff wrote a letter to the Chicago Quartermaster Purchasing Office, stating in part as follows:
As we understand it, you propose to furnish us 312 stellite exhaust valves from Government stock, transportation charges prepaid, of which we are to pack one m each spare parts kit. This necessitates our redesig-nating the corresponding item in the spare parts kit packing list, and repacking, and also our acceptance of cancellation of the original order for 312 part No. 23663 price $1.50 each.
The revised stellite valves we are now required to handle are Part No. 26515 price each $7.20. This makes our handling risk $2246.40 instead of the original amount of $468.00.
Our charge for the above will be $.75 per unit for a total reduction in the contract price of $234.00.
90. Modification “C” of the contract, which covered the matters that had been agreed upon at the conference of January 4,1950, and certain other matters as to which agreement was reached subsequently, deleted the requirement under item No. la of the contract for the furnishing by the plaintiff of standard exhaust valves in the spare parts kits, and provided instead that the Government would furnish Stellite exhaust valves for inclusion in the spare parts kits. The contract price was adjusted to reflect the fact that the plaintiff had been relieved of the requirement for the furnishing of an item costing $1.50, but had been allowed a service charge of 75 *754cents for the handling of the Government-furnished property. No allowance was made to the plaintiff on account of the fact that the Briggs & Stratton engines with which it-equipped the heaters furnished under item No. 1 of the contract had Stellite exhaust valves instead of standard exhaust-valves.

Radio Suppression System

91. A letter dated September 13, 1949, from the plaintiff' to the Chicago Quartermaster Purchasing Office stated in. part as follows:
The engines which we intend furnishing for subject contract are of the following specifications which-we have taken from the sample sent us for reproduction. Briggs and Stratton Model “N” Type 306317 * * * with * * * seat ignition shielding with suppressor * * *.
92. The plaintiff on October 24, 1949, wrote the following letter to the Inspection Service, Chicago Quartermaster Purchasing Office:
For the above referenced contract we are furnishing Briggs and Stratton’s Model N, Type 306317 Engines which are identical with the master sample Gasoline Tent Pleater which we received from the Jeffersonville Quartermaster Depot. Before purchasing these engines from the Briggs and Stratton Corp. we reviewed with them the contract requirement for radio suppression and we are advised that the engines which we are purchasing would have this requirement incorporated.
On October 17th we again wrote the Briggs and Strat-ton Corp. requesting clarification of this requirement and on October 21st they wrote us regarding same. We are enclosing this letter together with their enclosure from the Signal Corps and their drawings complete.. After you have finished with the above we would appreciate your returning same for our files.
We are sure that the Briggs and Stratton engines-which we are purchasing will meet your requirements and that you will approve same as soon as possible after your investigation.
93. In a letter dated November 28, 1949, and addressed to-the plaintiff, the contracting officer stated in part as follows:
The radio suppression for the Briggs and Stratton engine as previously approved by the Signal Corps was *755on the basis of temporary war time expediency as the-desired suppression components were not then commercially available in sufficient quantity. There has been developed since the previous approval a method of radio-suppression by the Signal Corps Laboratories for a Briggs and Stratton model “I” engine described in Technical Manual No. M-1140 and Engineering Memorandum D-305-E-P-45 of which copies are inclosed. This method of suppression is superior at the higher-frequencies and from a field maintenance viewpoint and is desired to meet military requirements.
Information is requested at the very earliest possible-date as to whether or not this latest method of suppression for the Briggs and Stratton model “I” engine is obtainable under the contract and, if by reason of the, proposed change from the previous method of suppression, the contract cost would require adjustment. It is. requested that you discuss this matter with the Briggs and Stratton people and present your findings for our consideration and early action.
94. On December 17, 1949, the plaintiff wrote the following letter to the Chicago Quartermaster Purchasing Office:-
Immediately upon receipt of your letter of 28 November 1949 we forwarded a copy of same to the Briggs-, and Stratton Corp. We also reviewed this correspondence with their representative, Mr. Frank Maloney, on his visit to our plant November 30th.
We are now in receipt of two letters from the Briggs, and Stratton Corp. having received their December 12th on the 14th and their December 13 letter in today’s mail December 17th.
We are enclosing copies of same.
After you have reviewed this correspondence please advise your decision.
95. A letter dated December 22, 1949, from the contracting officer to the plaintiff stated in part as follows:
In reply to your letter concerning radio suppression for Heaters, Tent, Gasoline, under Contract 7594-GS-49, including comments of the Briggs & Stratton Corporation, it has been determined that shielding in accordance with Signal Corps Technical Memorandum, No. M-1233 dated 28 October 1949 believed to be the-application essentially as shown in Drawing ES-B-78319-B will satisfy all requirements. It is therefore-requested that you advise to what extent the contract value would be affected by this change. Upon receipt-. *756of your advice, tbe matter will be forwarded to tbe Office of Tbe Quartermaster General for decision as to whether or not such change will be officially authorized.
96. On December 27, 1949, the contracting officer telephoned to the plaintiff and asked for a quotation on the price that would be involved in making the proposed change to the newer type of radio suppression system. As of that time, the plaintiff had not obtained a price quotation from the Briggs & Stratton Corporation.
97. The substitution of the improved radio suppression system for the one on the Briggs & Stratton engine in the •sample Herman Nelson heater was discussed at the conference in Chicago on January 4, 1950 (see finding 43). The plaintiff informed the contracting officer that it had been advised by the Briggs & Stratton Corporation that the •cost of providing the improved radio suppression system for the heater engines would be $16.65 per engine, with no credit allowed for the return of the existing parts, and that the cost of the related components for inclusion in the spare parts kits would be $16 per kit, in lieu of $3 per kit for the suppression components provided for in item No. la of the contract.
98. A letter dated January 10, 1950, from the plaintiff to the Chicago Quartermaster Purchasing Office stated in part as follows:
Briggs & Stratton said that the earliest shipment of any items on the radio suppression changes would be 45 days. The price of the shielding installed on each of the 312 engines is $16.65 and the price of each shielded spark plug is $8.00. There are two spark plugs per unit specified in the spare parts or 624 total. All these prices are net extra, the small credit Briggs & Stratton will allow for return of present parts being used to offset transportation charges on the above items.
99. A letter dated January 17, 1950, from the plaintiff to the Chicago Quartermaster Purchasing Office stated in part as follows:
Mr. A. P. Doyle, Jr., Engine Division of Briggs and Stratton Corp. Milwaukee, Wisconsin, has written us 1-16-50 as follows:
*757“Following our conversation with Captain King and Mr. Field of Quartermaster’s Office in Chicago, enclosed, in triplicate, are copies of our certification to the effect that shielding supplied you on P. O. 05926 is the same as supplied to Signal Corps on the engine they verbally approved as meeting U.S. Army Specification 71-3214.”
Since this refers to a conversation with your office, we thought you might want a copy of the referenced certification so are enclosing same herewith. The “P. O. 05926” mentioned is our purchase order placed with Briggs and Stratton to cover the radio suppression requirement you informed us was being added to our contract above referenced.
100. Modification “C” of the contract, which was originally issued by the contracting officer on January 19, 1950, was received by the plaintiff on January 23, 1950, and was ultimately accepted by the plaintiff,7 provided for the use of the improved radio suppression system on the heater engines, and for the substitution of the improved components in the spare parts kits. Appropriate changes were made in the contract price.

Pamb

101. Paragraph Gr-5.3.4 of AAF Specification No. 40317-C, as amended, provided that both the inside and outside of all containers should be covered with one coat of “l'usterless olive-drab paint complying with Federal Specification TT-P-81” (see finding 9(h)). In procuring supplies for the performance of the contract, the plaintiff was unable to obtain a lusterless olive-drab paint that complied with the specification cited.
102. On December 14, 1949, the plaintiff proposed in a letter to the Chicago Quartermaster Purchasing Office that paragraph G-5.3.4 of the pertinent specification be changed by striking out the word “lusterless.” 8
103. The letter mentioned in finding 102 was supplemented by a further communication from the plaintiff to the Chi*758cago Quartermaster Purchasing Office under the date of December 27, ,1949, in which the plaintiff stated that the proposed change would not affect the contract price.
104. A letter dated December 28, 1949, from the contracting officer to the plaintiff stated that the plaintiff’s proposal with respect to the container finish had been disapproved. It was proposed that the word “lusterless” should be interpreted to mean that containers should have a lusterless appearance when dried, after an application of one coat of olive-drab paint complying with Federal Specification TT-P-81.
105. The matter of the container finish was discussed at the conference in Chicago on January 4, 1950 (see finding 43). It was agreed by the contracting officer at the conference that paragraph G-5.3.4 of the pertinent specification would be amended by deleting the word “lusterless,” as proposed by the plaintiff.
106. Modification “C” of the contract, which was originally issued by the contracting officer under the date of January 19, 1950, and was ultimately accepted by the plaintiff, revised paragraph G-5.3.4 of AAF Specification No. 40317-C, as previously amended, by deleting the word “lusterless.”

Combustion Chamber Steel

107. The top and bottom of the combustion chamber in the sample Herman Nelson heater which the plaintiff received from the Quartermaster Corps on July 13, 1949, and which the parties agreed on August 12, 1949, would be duplicated by the plaintiff in the performance of the contract, were made of stainless steel .025 inch in thickness. When the plaintiff endeavored to procure steel from which to fabricate the combustion chambers to be used in the heaters manufactured under the contract, the plaintiff discovered that .025-inch steel, although a normal commercial gauge, was not obtainable on the market at the time because of a steel shortage resulting from a strike in the steel industry. However, the plaintiff was able to obtain stainless steel that was .0375 inch in thickness.
108. (a) On October 20, 1949, a representative of the plaintiff discussed this matter with personnel of the Research *759and Development Laboratories at Jeffersonville. Such personnel was not, as of that time, in the regular channel of communication between the plaintiff and the contracting officer for the consideration of problems arising in connection with the performance of the contract. After that conversation, the plaintiff on the same date wrote a letter to the Research and Development Laboratories, stating in part as follows:
We also wish to confirm our conversation regarding the gauge of material which we are planning to use on the combustion chamber drum, our drawing No. VQ, 903. We feel that the stainless steel sheet material, type 430, for the top of this drum should be .0375 instead of .025. In fact it is our intention on the present contract to use .0375 material on both the top and the bottom of this drum and understand that this is agreeable to your office in as much as we are furnishing same at no extra cost to our Government.
If there are any objections to the above, please notify us at once because if we do not hear further from you we will proceed as outlined above.
(b) The evidence does not show that the plaintiff’s letter of October 20,1949, was forwarded to the contracting officer for consideration.
109. By means of a letter dated December 14, 1949, the plaintiff submitted to the contracting officer, through appropriate channels, a proposal that .0375-inch stainless steel be used in fabricating the top and bottom of the combustion chamber.
110. The contracting officer inquired of the plaintiff in a telephone conversation on December 27, 1949, as to whether there would be an increase in the contract price if steel .0375 inch in thickness were to be used in the combustion chamber instead of .025-inch steel. The plaintiff on the same day wrote a letter to the Chicago Quartermaster Purchasing Office, stating that the increased cost from the use of .0375-inch steel in the combusion chamber would be $2.26 per unit, or a total of $705.12 for the 312 units.
111. At th9 conference in Chicago on January 4,1950 (see finding 43), it was agreed by the contracting officer that there would be added to AAF Specification No. 40317-C, as previously amended, a new paragraph designated as E-24 providing (among other things) that steel .0375 inch in thick*760ness might foe utilized at the contractor’s option for the top and bottom of the combustion chamber drum.
112. Modification “C” of the contract, which was originally issued by the contracting officer under the date of January 19, 1950, for the purpose of carrying out the various agreements that were reached at the conference on January 4, 1950, and which was ultimately accepted by the plaintiff, added to AAF Specification No. 40317-C, as previously amended, a new paragraph designated as E-24, providing (among other things) “that a metal thickness for the top and bottom of the [combustion chamber] drum of .0375" thick may be utilized at the contractor’s option.” No adjustment in the contract price was made on account of this change.

Fuel Tanh

113. The sample Herman Nelson heater which the plaintiff received from the Quartermaster Corps on July 13,1949, and which the parties agreed at the conference on August 12, 1949, would be duplicated by the plaintiff in manufacturing heaters under item No. 1 of the contract, was equipped with a fuel tank that had a soldered seam. However, when the plaintiff on September 17,1949, submitted to the contracting officer for approval a drawing relative to the fuel tank, the drawing indicated that the proposed fuel tank would have a welded seam. This proposed modification was based upon a recommendation by a gas tank manufacturer and was intended to improve the durability of the tank. No explanation was furnished by the plaintiff to the contracting officer at the time when the drawing was submitted.
114. The proposal to substitute a gas tank with a welded seam for the gas tank with a soldered seam was discussed at a conference on October 20, 1949, by a representative of the plaintiff with personnel of the Eesearch and Development Laboratories at Jeffersonville. Such personnel was not, at the time, in the authorized channel of communication' between the plaintiff and the contracting officer with respect to problems arising in connection with the performance of the contract.
115. Under the date of December 14, 1949, the plaintiff submitted to the contracting officer, through appropriate *761channels, a proposal that it be authorized to furnish a seam-welded fuel tank in lieu of the fuel tank with soldered seam on the sample Herman Nelson heater.
116. On December 27, 1949, the contracting officer telephoned to the plaintiff and asked whether any increase in the contract price would be involved in the proposal to substitute a seam-welded fuel tank for the fuel tank with soldered seam. The plaintiff informed the contracting officer that no increase in the contract price would be involved, whereupon the contracting officer orally approved the proposed change. The plaintiff in a letter dated December 27,1949, to the contracting officer confirmed its oral statement that its proposal relative to the fuel tank would not involve any increase in the contract price.
117. The oral agreement respecting the substitution of a seam-welded fuel tank for the fuel tank with soldered seam on the sample Herman Nelson heater was confirmed at the conference in Chicago on January 4, 1950 (see finding 43).
118. Modification “C” of the contract, which was originally issued by the contracting officer under the date of January 19, 1950, and which was ultimately accepted by the plaintiff, modified the contract so as to provide specifically for the furnishing by the plaintiff, as part of each heater supplied under the contract, of a fuel tank with welded seam in accordance with the drawing which the plaintiff had submitted under the date of September 17, 1949.

Instruction Plates

119. The plaintiff was required to furnish 13 instruction plates as part of each heater supplied under item No. 1 of the contract, and it was the intention of the plaintiff to purchase these plates rather than to fabricate them in its own plant. Drawings relative to the proposed instruction plates, together with samples of such plates, were transmitted by the plaintiff under the date of October 5, 1949, to the contracting officer for approval.
120. Although the contracting officer had not approved the instruction-plate drawings at the time, the plaintiff went ahead sometime during the latter part of October 1949 and ordered from a supplier instruction plates that would be in *762accordance with the drawings which the plaintiff had submitted to the contracting officer on October 5, 1949.
121. The instruction-plate drawings were mailed back to the plaintiff by the contracting officer, with his approval, on December 19, 1949. They were received by the plaintiff on December 21,1949.

Gasket for Oleanout Cover

122. There were two cleanout holes in the combustion chamber of the sample Herman Nelson heater which was furnished by the Quartermaster Corps to the plaintiff on July 13, 1949, and which the parties agreed on August 12, 1949, would be duplicated by the plaintiff in supplying heaters under item No. 1 of the contract. Each hole was covered by a small, circular metal plate called a cleanout cover, and each cleanout cover was fitted with a gasket made of woven material in the form of a solid circular disk.
123. Under the date of December 14, 1949, the plaintiff submitted to the contracting officer, through appropriate channels, a proposal that an asbestos gasket made in the form of a hollow circle be substituted for the type of gasket that was on the sample Herman Nelson heater. In making this proposal, the plaintiff stated that the purpose was “To increase the thermal efficiency of the unit by making the cleanout cover available for heat transfer.” A drawing of the type of gasket which the plaintiff proposed to use was submitted with this recommendation.
124. On December 27, 1949, the contracting officer called the plaintiff on the telephone and asked whether the plaintiff’s proposal concerning the cleanout cover gasket would involve any increase in the contract price. Upon receiving a negative reply from the plaintiff, the contracting officer orally authorized the proposed change. On the same day, the plaintiff confirmed in writing its statement to the effect that its proposal relative to the cleanout cover gasket would not involve any increase in the contract price.
125. The oral understanding of December 27, 1949 (see finding 124) was confirmed at the conference that was held in Chicago on January 4, 1950 (see finding 43).
126. Modification “C” of the contract, which the contracting officer originally issued under the date of January 19, *7631950, and which was ultimately accepted by the plaintiff, modified A AF Specification 40317-C, as previously amended, by adding a new paragraph which was designated as E-23 and provided that the gasket for the cleanout cover should be made in accordance with the drawing submitted by the plaintiff.

Burner Fuel Filter

127. The sample Herman Nelson heater which was furnished to the plaintiff by the Quartermaster Corps was equipped with a burner fuel filter. The plaintiff intended to purchase this part for the heaters to be manufactured under item No. 1 of the contract. When the plaintiff placed an order with the manufacturer for a supply of burner fuel filters similar to the one on the sample Herman Nelson heater, the manufacturer informed the plaintiff that the particular model of the filter involved in the order was outmoded, and that a later model was available.
128. On or about October 20, 1949, a representative of the plaintiff called the attention of personnel of the Research and Development Laboratories at Jeffersonville to the fact that the sample Herman Nelson heater was equipped with an outmoded burner fuel filter. At that time, the personnel at Jeffersonville was not in the authorized channel of communication between the plaintiff and the contracting officer with respect to problems arising in connection with the performance of the contract.9
129. At the conference in Chicago on January 4,1950 (see finding 43), it was agreed by the contracting officer, with respect to the burner fuel filter, that the plaintiff would be authorized to substitute the latest model in order to overcome obsolescence.
130. Modification “C” of the contract, which the contracting officer originally issued on January 19, 1950, and which was ultimately accepted by the plaintiff, modified the contract so as to provide as follows with respect to the burner fuel filter:
*764Substitution of the latest production model is authorized to overcome obsolescence.

Combustion Chamber Drawings

131. Under the date of August 15, 1949, the plaintiff submitted to the contracting officer, for approval, a series of 17 drawings relating to the combustion chamber in the sample Herman Nelson heater. The contracting officer, in turn, forwarded these drawings on August 16, 1949, to the Eesearch and Development Laboratories at Jeffersonville for consideration.
132. On September 6,1949, the Eesearch and Development Laboratories at Jeffersonville requested the plaintiff to forward the combustion chamber out of the sample Herman Nelson heater to the Laboratories, in order that the plaintiff’s drawings might be checked against the combustion chamber. The plaintiff complied with this request on the date mentioned.
133. The Eesearch and Development Laboratories returned the combustion chamber to the plaintiff on September 12, 1949.
134. On September 22, 1949, the contracting officer mailed the combustion chamber drawings to the plaintiff, with his approval. The drawings were received by the plaintiff on September 26, 1949.
135. The Government’s delay in acting on the combustion chamber drawings delayed the plaintiff’s operations under the contract and increased the plaintiff’s costs.

Cabinet Drawings

136. Sixteen drawings relative to the cabinet portion of the sample Herman Nelson heater were transmitted on September 17,1949, by the plaintiff to the contracting officer for approval. In turn, the contracting officer on September 23, 1949, forwarded these drawings to the Eesearch and Development Laboratories at Jeffersonville for consideration.
137. On September 29, 1949, the Eesearch and Development Laboratories requested the plaintiff to lend the cabinet from the sample heater to the Laboratories so that a comparison could be made between the cabinet and the plaintiff’s drawings.
*765138. The Research and Development Laboratories returned the cabinet to the plaintiff on October 5,1949. At that time, the plaintiff was informed that the cabinet drawings were incomplete, and that additional drawings of the cabinet would have to be submitted.
139. The additional drawings of the cabinet were delivered to the contracting officer in Chicago by a representative of the plaintiff on November 4,1949. The additional drawings were immediately forwarded by the contracting officer to the Research and Development Laboratories at Jefferson-ville for review.
140. On December 28, 1949, the contracting officer mailed the cabinet drawings, with his approval, to the plaintiff. The drawings were received by the plaintiff on January 3, 1950.
141. The Government’s delay after November 4, 1949, in passing on the cabinet drawings delayed the plaintiff’s operations under the contract and increased the plaintiff’s costs.

Burner Air Chamber Drawing

142. The plaintiff on October 5, 1949, mailed to the contracting officer a drawing relative to the burner air chamber in the sample Herman Nelson heater. The drawing of the burner air chamber was received by the contracting officer on October 6, 1949, and was then forwarded on October 10, 1949, to the Research and Development Laboratories at Jefferson-ville for consideration.
143. The drawing referred to in finding 142 was mailed back to the plaintiff by the contracting officer on October 21, 1949, with suggested revisions. A covering letter requested that this drawing be resubmitted with related drawings for the complete combustion air duct. The drawing and letter were received by the plaintiff on October 24, 1949.
144. A revised drawing of the burner air chamber, and the related drawings requested by the contracting officer in his letter of October 21, 1949, were submitted to the contracting officer in Chicago by a representative of the plaintiff on November 4, 1949.
*766145. On December 16, 1949, the plaintiff was notified that the drawing for the burner air chamber, and the related drawings, had been approved.
146. The Government’s delay after November 4, 1949, in passing on the burner air chamber drawing and related drawings delayed the plaintiff’s operations under the contract, and increased the plaintiff’s costs.

Drawings of Miscellaneous Heater Components

147. At a conference that was held in Chicago on November 4, 1949, Alvin E. Vogt delivered to the contracting officer, for approval, approximately 20 drawings of miscellaneous components in the sample Plerman Nelson heater.
148. On December 28, 1949, the contracting officer mailed the drawings mentioned in finding 147 to the plaintiff, with his approval. The approved drawings were received by the plaintiff on January 3, 1950.
149. The Government’s delay in passing on the drawings of miscellaneous heater components delayed the plaintiff’s operations under the contract and increased the plaintiff’s costs.
CONCLUSION OF LAW
Upon the foregoingfindings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover. Judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).

 C. Lyman Vogt’s tenure as treasurer commenced In 1950. At a later time, lie also became secretary of the corporation.

 The specific details of the conversations between the plaintiff’s representa, tlves and personnel of the Research and Development Laboratories cannot be-reconstrueted accurately at this late date. The present-day recollections of-persons who participated in the conversations differ as to what was said. The-impression gained by the plaintiff’s representatives, however, was as stated In paragraph (c) above, whether this was based upon a correct understanding- or a misunderstanding of what was actually said by personnel of the Quartermaster Corps at the Research and Development Laboratories cannot be. definitely ascertained.

 The word "cost” was subsequently changed to "coat” in the contract that -developed out of the invitation for bids.

 Tghisprovision was set out in the invitation for bids. The plaintiff’s bid was submitted on its copy of the invitation, and the plaintiff’s bid was then incorporated in and made a part of the contract by reference.

 The plaintiff’s officers apparently had overlooked the provision of the invitation for bids relating to the subject of contract drawings.

 While awaiting clarification of the question whether the Torrington fan or the Herman Nelson fan would be used on the heaters, the plaintiff submitted' a drawing of the Herman Nelson fan on October 5, 194ft, and this drawing was returned to the plaintiff for supplemental data on, October 21, 1949 (see finding 38). The plaintiff did not make a resubmission of the fan drawing until after the question of which fan was to be used had been determined at the conference on January 4, 1950.

 The original version of modification “C” was not satisfactory, to the plaintiff for reasons unrelated to the radio suppression system.

 There is hearsay testimony, but no competent evidence, to the effect that this matter was brought to the attention of the contracting officer at a,conference on November 4, 1949.

 There is hearsay testimony, but no competent evidence, to the effect that this matter was discussed by a representative of the plaintiff with personnel of the Chicago Quartermaster Purchasing Office at a conference on November 4, 1949.